## HARNESS v. LUTTRALL. (No. 9385.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 6, 1920. Rehearing Denied Dec. 4, 1920.)

1. **Sales** ⬅➡23(3)—**Contract completed by seller's acceptance.**

Where buyer's offer presented by his agent was accepted by seller under circumstances indicating that the contract was concluded by the seller's acceptance, no formal acceptance by the buyer was necessary.

2. **Evidence** ⬅➡442(1)—**Parol evidence admissible where part of transaction is not in writing.**

Where a written instrument forms a part of a more comprehensive transaction, the terms of which are not attempted to be expressed in writing, parol testimony as to such parts of the transaction as were not reduced to writing is admissible.

3. **Sales** ⬅➡19, 20—**Promise to buy sufficient consideration for promise to sell.**

In a contract for the sale and purchase of cotton, the buyer's promise to buy is sufficient consideration for the seller's promise to sell, so that the seller cannot avoid liability on the contract on the ground that the stated consideration of $1 was never paid to him.

4. **Sales** ⬅➡418(2)—**Market price on first market day after default held proper evidence of damages.**

Where a contract for the sale of cotton authorized delivery on or prior to a stated date, evidence of the market price of cotton on the day following that date is sufficient to establish the buyer's damages, since the reason for the rule fixing the market price on the day of delivery as the basis for measuring damages is to enable the buyer to purchase the goods elsewhere, and, where the seller had the full day to make delivery, the buyer could not purchase other goods until the following day.

5. **Contracts** ⬅➡10(4)—**Buyer's right to grade does not invalidate contract.**

A provision in a contract for the purchase of cotton giving the buyer the right to fix the grade of the cotton, which is a common provision in such contracts, does not render it unenforceable against the seller.

6. **Sales** ⬅➡1(4)—**Provision for attorney's fees held not too uncertain.**

A provision in a contract for the sale of cotton to be delivered on or prior to a stated date that, if either party brought suit to enforce performance of the contract, 10 per cent. additional should be included in the judgment for attorney's fees, is not so uncertain as to require it to be disregarded.

Appeal from District Court, Mitchell County; W. W. Beall, Judge.

Action by C. T. Harness against J. P. Luttrall. Judgment for defendant on directed

---

verdict, and plaintiff appeals. Reversed and remanded.

Royall G. Smith, of El Paso, and Thos. R. Smith, of Colorado, Tex., for appellant.

James Spiller, of Sweetwater, for appellee.

CONNER, C. J. The appellant, C. T. Harness, instituted this suit in the district court of Mitchell county to recover $660.37, alleged to be the difference in the market price and in the contract price of 10 bales of cotton which it was alleged the appellee contracted to deliver. The contract to deliver declared upon was set out in the petition and is as follows:

"The State of Texas, County of Mitchell.

"Know all men by these presents:

"That I, J. P. Luttrall, of Loraine of the county of Mitchell, state of Texas, for and in consideration of one dollar and other valuable consideration to me in hand paid, the receipt of which is hereby acknowledged, and the further consideration of twenty-eight cents per pound basis middling, to be paid to me, C. T. Harness, Colorado, Mitchell county, Texas, when the cotton is delivered to him have bargained and sold, and by these presents do bargain and sell unto the said C. T. Harness 10 bales of 1919 season's run cotton strict low middling and better to be delivered by me to him at Loraine, Texas, at any time prior to but not later than October 31, 1919, which said cotton I warrant to be free from incumbrances and be my individual property, said cotton to be raised by me during the year 1919, and in event I do not raise above number of deliverable bales of cotton, I agree to obtain deficiency elsewhere and deliver to C. T. Harness on terms above stated. The grades of C. T. Harness are to be accepted. It is agreed that in the event of suit by either party for performance of this contract, that 10 per cent. additional shall be included in judgment for attorney's fees, and that jurisdiction will be in Colorado, Mitchell county, Texas.

"Witness my signature this 18 day of September, A. D. 1919.　　　　J. P. Luttrall.

"Witness: Jim Johnson.

"Accepted by C. T. Harness."

The evidence shows without dispute that Jim Johnson, whose name appears to the foregoing contract, was authorized to go into the field and buy 30 bales of cotton. He testified:

"They (appellant) called me up and told me that I could buy a limited number of bales, I believe it was 30 bales, at 28 cents, and I believe that Mr. Luttrall was the last man that I saw that signed the contract for the cotton."

He further testified that he was directed to report purchases in as soon as he signed a contract, and that he did report the contract in question immediately to Mr. Harness and later inclosed it in a letter to him. He further testified:

"There wasn't anything said at the time about that dollar, nothing whatever. * * * I was just representing Mr. Harness. I was not interested in any way in the deal, only he gave me $1 to write up the contract. * * * I didn't sign Mr. Harness' name to that contract, and Harness' name was not signed there at the time that Mr. Luttrall executed the contract. I signed it there as a witness; and all I did was then to send it in with mine and Mr. Luttrall's names signed to it. Yes, sir; I signed that there as a witness. * * * At the time that he (Luttrall) signed the contract and turned it over to me, delivered it to me, I was acting as Mr. Harness' agent. I took it for what it was on its face, as a sale of the cotton. The fact is, gentlemen, I never once presumed of having the contract questioned. I was there to help Luttrall in the sale, treating him right in it, and I thought he was my friend. If I had suspicioned there was anything wrong then, I would not have had anything to do with it. If I had suspicioned that there was anything wrong with that contract, I would not have reported that cotton. I would have worked a great deal harder to keep from reporting it. It was my impression that Luttrall wanted me to help push the sale through. In fact, I was going to give Luttrall the dollar myself when he come again, but he didn't come in to see about it until the 17th day of October after that. He come in and asked if I had phoned Harness, and I told him that was a kind of oversight, and I had overlooked it, and I offered to pay him the dollar. He didn't take it. I was out there on the street, and I says, 'If you want that dollar, I will give it to you,' and he says, 'I don't want it. Cotton has gone up, and I don't want to sell mine so low.' Gentlemen, that is the truth about it."

It was admitted that the $1 consideration recited in the contract was not paid and that the cotton was never delivered, as specified therein. The only other witness who testified was appellant, C. T. Harness. He testified:

"I remember Mr. Johnson calling me up over the telephone and having a conversation with me with reference to what he had done on that particular date. * * * He reported to me the purchase of cotton by him at Loraine. He reported to me the taking of these contracts. He did not tell me the names of the people that he had bought from. He told me on the phone that he had mailed the contracts to me. That is the instructions he had. He gave me the number of bales that he bought, and that night he mailed in these contracts to cover 30 or 40 bales, or 10, or whatever he had bought. I kept a record of the cotton I had bought, and on that day I made a record of the cotton I had bought, I made an entry of the purchase of each one of these contracts, and I expect there were other entries made at the same time. I kept it all in that way.

"I was familiar with the market value of cotton at Colorado and at Loraine on the 1st day of November, 1919; middling cotton I bought some on that date. As to what the prevailing market price was, I paid 39³/₁₆ basis. I paid the market price. I have been in the cotton business about 20 years. I was familiar with the prevailing market price, and that was the prevailing market price on that

date, 39⅜/₁₆. * * * I say in that contract that the grades of C. T. Harness are to be accepted, and naturally I had the right to pass on that cotton; and I wasn't taking any low middling on that contract. It would have to be a better grade, and I intended to class the cotton.

"Q. All right. Now, Mr. Harness, if he offered this cotton to you and you didn't want to take it, you could just grade it lower than low middling, and refuse it? A. That is nonsense. I did not draw that contract that way with that provision in it so that I could get out of it in case the market went down. The reason I put that in there is because every bale of cotton I buy my class is supposed to stand on it. I don't take the other man's class, and neither does anybody else that buys cotton.

"I sent out quite a number of these contracts. In this contract it says that he will deliver so many bales of cotton to me on or before, not later than, October 31st. I did not demand those bales of cotton before October 31st."

Appellant further testified that he had indorsed the terms, "accepted by C. T. Harness," on the contract, but did not remember whether that was done immediately upon its receipt or later; that the contract had been signed with other of like kind, but that he had never sent to Mr. Luttrall a copy of the contract after its indorsement by him, nor did he write him that he has signed it. He testified:

"I just made it—made an entry on my books. I signed this and kept it myself—put it in the bank. I don't know how long after September 18th it was that I signed that, and I don't know whether Mr. Luttrall ever knew I signed it or not."

No further testimony was offered, whereupon the court gave a peremptory instruction to the jury to find for the defendant, and the verdict was so rendered, and the plaintiff has prosecuted this appeal from the judgment that was in accordance with the verdict.

We are of the opinion that the trial court misapprehended the nature of the transaction detailed above. From the contentions of appellee in support of the judgment, we assume that the trial court acted upon the theory that the written instrument, signed by Luttrall and declared upon by the appellant, alone constituted the contract between the parties and could not be aided by evidence beyond its terms, and that in order to make the written instrument effective it must be shown to have been accepted by appellant and notice of such acceptance given to appellee, and also that the instrument was nonenforceable because of a failure to pay the pecuniary consideration expressed in the instrument. Appellee also makes the further contention that the court's instruction was proper for the reason that no proper measure of damages was shown, the insistence being that the market value of the cotton upon the 31st day of October (the last day upon which, by the terms of the contract, the cotton could have been delivered) constituted the true measure of damages, and not the market value on the following day, November 1st as shown by appellant's testimony.

[1-3] We think the evidence as a whole at least tends to show that appellant authorized Jim Johnson, as agent, to go into the field and purchase 30 bales of cotton upon the terms stated in the written instrument, and that such agent submitted a proposition to appellee, Luttrall, and Luttrall agreed to the terms and executed the written instrument as his part of the agreement. In other words, that the transaction amounted simply to a proposition of appellant, acting through his agent, on the one hand, and an acceptance of the proposition by appellee, on the other. If so, it is immaterial that the proposition may have been oral, for it is well settled that, where written instruments form a part of a more comprehensive transaction, the terms of which are not attempted to be expressed in writing, parol testimony as to such parts of the transaction as were not reduced to writing is admissible and operative. See Thomas v. Hammond, 47 Tex. 42. In such cases, of course, the contract is to be determined by a consideration of the entire transaction. We are of the opinion, therefore, that the issues should not have been taken from the jury, for if the negotiations were such as indicated the contract was concluded when appellee signed and delivered it to appellant's agent, and no formal acceptance thereof on appellant's part was necessary. Appellee's acceptance would complete the contract. It follows also that the failure to pay the $1 consideration named in the instrument, even if not waived by appellee, would be immaterial, for it is well settled that a promise for a promise is sufficient consideration to support a contract, and in the contract before us, as indicated by all the circumstances, there was a promise by appellant to pay 28 cents per pound for cotton for certain grades delivered to him at any time before October 31st, and the promise on appellee's part that for such consideration he would deliver the cotton.

[4] The question of the proper rule of damages may be somewhat more difficult. Appellee cites a number of cases in support of his contention, and it is undeniably true that, as a general rule in cases where there has been a nondelivery of personal property contracted for, the measure of damages is the difference between the contract price and the market value of the article upon the day when the property was to be delivered. Mr. Sedgwick in his standard work on Measure of Damages (4th Ed. p. 260), says:

"Where contracts for the value of chattels are broken by the vendor's failing to deliver

property according to the terms of the bargain, it seems to be well settled, as a general rule, both in England and the United States, that the measure of damages is the difference between the contract price and the market value of the article at the time it should be delivered upon the ground; that this is the plaintiff's real loss; and that with this sum he can go into the market and supply himself with the same article from another vendor."

The books note a number of exceptions to the general rule as stated by Mr. Sedgwick, and the great weight of the adjudicated cases, such as, where at the place of delivery there is no market for goods of that kind, then proof of the market value of such goods at the nearest market may be made. All rules of damage, however, are predicated upon the idea that the party injured by a breach of contract should be awarded just compensation, and the reason given by Mr. Sedgwick for fixing the market price on the day of delivery is that the damages so fixed will enable the plaintiff to go into the market and with the sum awarded purchase the same article from another, and thus avoid any real loss.

In the case before us, the appellant testified without contradiction that he was acquainted with the market price of cotton such as appellee agreed to deliver on the first market day following October 31st, to wit, November 1st. Appellee evidently had all of October 31st within which to comply with his contract to deliver, and appellant could not, before the market of November 1st, have gone into the market and remedied his loss by the purchase of a like quantity of cotton. The proof shows that he did this, and we think it was so done at the earliest moment that he could have purchased the cotton, and that his real loss is to be measured by the difference in the contract price and the market price he was required to pay in order to relieve himself of appellee's failure to deliver.

[5] Nor do we think appellee can be relieved on the ground that his contract to deliver conferred upon appellant the privilege of grading the cotton. Appellant testified to the effect that such was the universal custom of cotton buyers, and the law will not assume or even permit a buyer under such proof to exercise and receive benefit from an arbitrary classification.

[6] We also see no such uncertainty in the provision relating to attorney's fees as will authorize a disregard of that provision.

We note that the plaintiff's petition, and the evidence perhaps, fails to clearly set forth the specific authority of the agent Johnson. But this may be accounted for, doubtless, on the ground that in this respect no objection seems to have been made to either petition or evidence.

We conclude that the judgment must be reversed, and the cause remanded.