TEXAS FARM BUREAU COTTON ASSOCIATION v. J. C. STOVALL.

No. 3972.   Decided June 30, 1923.

(253 S. W., 1101.)

1.—Contract—Mutuality.

A contract must be based upon a valid consideration and an agreement in which there is no consideration moving from one party, or no obligation

upon him, lacks mutuality, is unilateral and unenforceable; but a promise by one party is a valid consideration for the promise of the other. (Pp. 284, 285).

### 2.—Same—Marketing Association—Undertaking with Member.

A contract between the Texas Farm Bureau Cotton Association and one becoming thereby a member of such association and undertaking to sell and deliver to it, and not to another, all cotton raised or controlled by him during five years, is here considered and held not to be unilateral or incapable of enforcement by the association; because a consideration for the members promise was furnished by the following things undertaken to be done by the association: (a) to buy all cotton produced by the member during those years; (b) to grade and classify the same for its proper marketing; (c) to pool his cotton with that of the same class from other members, giving him a proportional interest in the net proceeds of the marketing of all cotton classed with his; (d) to sell the cotton so pooled at the best price obtainable, and gradually as required by the spinners. (e) There was also a consideration moving to the member from the undertakings of other members who, under similar contracts pooled their cotton with his for sale to the best advantage by the association. (Pp. 280-286).

### 3.—Same—Contract—Certainty—Subject Matter.

· A description of cotton undertaken to be bought as all that to be produced by the seller during certain years is sufficient to identify the subject matter of the agreement. (Pp. 286, 287).

### 4.—Same—Term of Performance.

A description of the time of delivery and acceptance by the purchaser of cotton undertaken to be sold as "the earliest reasonable time after ginning," and of the time within which the purchaser was to resell for the producers benefit as "before another crop is produced," were each sufficiently definite and certain as to the time of performance of the contract by either party. (P. 287).

### 5.—Same—Implied Undertaking.

A contract should not be pronounced invalid because silent as to the time of performance; since the law would imply a promise to perform in a reasonable time. (P. 287).

### 6.—Same—Place of Delivery.

Delivery of cotton to be sold at the warehouse of the purchaser, or at the nearest public warehouse, or at other warehouses more convenient, to be specified, or by shipment as directed, is sufficiently definite as a designation of the place for delivery. (P. 287).

### 7.—Same—Place of Payment.

Where the contract specifies no place for the payment of money the statute (Rev. Stats., Art. 1830) makes it certain as the county of the payer's domicile. (P. 287).

### 8.—Same—Price.

A contract is sufficiently definite as to the price to be paid for the articles bought and sold when such price is capable of ascertainment by its terms, as where the price of cotton is to be its proportionate part of the net proceeds of cotton of the same classification pooled with it for more advantageous sale. This method of determining net proceeds is in common use in sales on commission. Besides, this form of contract seems specially au-

thorized by the Co-operative Marketing Act. Vernon's Stats., Supp. 1922. Art. 14½, 3.   (Pp. 287, 288).

**9.—Same—Contract—Co-Operative Marketing Act—Agency or Sale—Mutuality —Specific Performance.**

It seems, from the terms of the statute and the contract here considered that the agreement between the association and a member for the marketing of cotton under the Co-operative Marketing Act was, in its essential aspects, one of sale by the member to the association and not merely one of agency. The parties agree that "this is a contract for the purchase and sale of personal property." The association is authorized to exercise all acts of ownership over the cotton after its delivery. The producer loses all dominion over it. But, irrespective of the class of the contract, the statute expressly gives the association remedies in equity to enforce specific performance of the producers agreement to deliver, irrespective of mutuality of remedy (Vernon's Stats., 1922, Supp., Art. 14½ s) and will control. And aside from the statute the nature of the business of the association, as a co-operative concern without capital stock would entitle it to such remedy.   (Pp. 288, 289).

**10.—Same—Liquidated Damages—Specific Performance.**

The provision in the contract for liquidated damages in case of non-delivery of the cotton by the producer does not deprive the association of its equitable remedy to enforce specific performance.   (P. 290).

**11.—Same.**

The fact that an action for damages by the producer for breach of the contract by the association would be inadequate because of absence of capital stock, does not deprive the contract of mutuality, since the producer, in such case, would be restricted to relief in equity. One deprived of the benefits of membership in an association of this kind may appeal to equity for redress.   (P. 290).

**12.—Same—Specific Performance—Difficulty of Enforcement.**

The difficulty of enforcing specific performance in favor of the producer because of the long series of acts in various placees by the association to be supervised by the court does not affect its jurisdiction, and the remedy through specific performance expressly given the association by the statute must control.   (Pp. 290, 291).

**13.—Same—Contract.**

The Appellate Court erred in holding that the contract here considered was unilateral, uncertain in its terms, and incapable of specific performance, and for these reasons sustaining the exception to plaintiff's petition.   (P. 291).

Error to the Court of Civil Appeals for the Fifth District, in an appeal from Ellis County.

The Texas Farm Bureau Cotton Association, a corporation organized under the Co-operative Marketing Act, sued Stovall. Demurrer was sustained to plaintiff's petition and the case dismissed on his declining to amend. The judgment was affirmed on plaintiff's appeal (248 S. W., 1109), and it obtained a writ of error on such ruling.

*Aaron Sapiro* and *C. K. Bullard,* and *F. M. Etheridge,* for Plaintiff in Error. *Birkhead & Long, Milton Sapiro, J. C. Lumkin,* and *Ether-*

*idge, McCormick & Bromberg,* were on brief in Court of Civil Appeals.

The marketing agreement is a valid contract founded upon sufficient consideration and not unilateral: (1) The requirement of ''mutuality'' is merely a requirement that an agreement be founded upon a valid consideration. 1 Williston on Contracts, par. 140; Texas Seed Co. v. Chicago Seed Co., 187 S. W., 747; Naylor v. Parker, 139 S. W., 93; Campbell v. American Co., 94 S. W., 815; City of New York v. Paoli, 116 N. Y. Supp., 544; St. Louis Co. v. Clark, 119 S. W., 825; Canton Co. v. B. & O. Co., 29 Atl., 821. (2) A promise is a valid consideration. Harness v. Luttrall, 225 S. W., 811; McKaskey v. McCall, 226 S. W., 432. (3) The association has made a number of binding promises. Harness v. Luttrall, supra; Crowdus Drug Co. v. Nichols, 194 S. W., 484; Texas Seed Co. v. Chicago Co., supra.

(4) Even though no consideration moved from the asoociation to defendant, the promises of all other grower members of the association are sufficient consideration for defendant's promise. McKaskey v. Schrock, 225 S. W., 418; McKaskey v. McCall, 226 S. W., 432; Burley Tobacco Soc. v. Gillaspy, 100 N. E., 89. (5) Under the marketing agreement the grower has an opportunity for profit which, standing alone, is sufficient consideration for his agreement. (6) Even though the contract were unilateral when made, it has been sufficiently executed on the part of the association to make it binding upon the grower. Texas Seed Co. v. Chicago Seed Co., supra; Faulkner v. Reed, 229 S. W., 945; Edwards v. Roberts, 209 S. W., 247.

The association and the marketing agreements are contracts between the parties to this case. Galveston Hotel Co. v. Bolton, 46 Texas, 633; McCord v. S. W. Sundries Co., 158 S. W., 226; Exline Co. v. Lone Star Co., 171 S. W., 1060; Railway Co. v. Granger, 86 Texas, 350, 24 S. W., 795; Lancaster Co. v. Murray Co., 47 S. W., 387.

The association is entitled to an injunction and a decree of specific performance. (1) The remedies of injunction and specific performance have been provided for this case by legislative enactment. (2) The legislature has exclusive power over the form of remedies to be granted by the courts and it is the duty of the courts to follow the statutes on such subjects. Ex parte Allison, 90 S. W., 492; Fristoe v. Blum, 45 S. W., 998; Earl v. Ryan, 41 Pa. Supr., 448; Iowa Cent. R. Co. v. Iowa, 160 U. S., 393; State v. Diamond Mills Co., 51 Atl., 1019; Commissioners v. Farmers' Bank, 21 Pick., 542. (3) Defendant has agreed to the remedies of injunction and specific performance; he is bound by his contract. Darst v. Kirk, 82 N. E., 862; Standifer v. Wilson, 54 S. W., 898; Wilson v. Standifer, 184 U. S., 399; Thompson v. Cobb, 65 S. W., 1090; Building Assn. v. Handy, 26 S. W.,

497; Pope Mfg. Co. v. Gormully, 144 U. S., 224; Watson v. Boswell, 61 S. W., 40; Loftus v. Maxey, 11 S. W., 272; Gillette v. Moody, 54 S. W., 35. (4) Even without a statute or a contract the remedies of injunction and specific performance would be allowed to the association upon the facts presented in this case. (a) Injunction. Lively v. Johnson, 76 Pac., 946; Ridenbaugh v. Thayer, 80 Pac., 229; Adams v. Messenger, 17 N. E., 491; American Smelting Co. v. Bunker Hill Co., 248 Fed., 172; Texas Oil Co. v. Central Co., 194 Fed., 1; Neal v. Parker, 57 Atl., 213; Curtice Bros. v. Catts, 66 Atl., 935; Oregon Growers' Cooperative Assn. v. Lentz, 212 Pac., 811; Grant County Board v. Allphin, 153 S. W., 417; Phez v. Salem Fruit Union, 201 Pac., 222; Owen County Society v. Brumback, 107 S. W., 710; Washington Egg and Poultry Association v. Taylor, 210 Pac., 807.

The court must determine whether the purpose of the contract was primarily to induce performance or to recover damages in case of breach. If performance was the purpose equitable relief will be granted irrespective of the liquidated damage provision; if damages were the principal object equitable relief will be denied. Moss v. Wren, 118 S. W., 149; Diamond Match Co. v. Roeber, 13 N. E., 419; Harris v. Theus, 43 So., 131; Wilkinson v. Colley, 30 Atl., 286.

Clearly a cooperative contract does not intend to substitute damages for performance.

The marketing agreement is certain, definite and capable of enforcement. (1) The subject matter of the sale is set forth with particularity. Stanley v. Sumrell, 163 S. W., 697; Curtice Bros. v. Catts, 66 Atl., 935; Gas Light Co. v. Coal Tar Co., 63 Md., 285; American Smelting Co. v. Bunker Hill Mining Co., 248 Fed., 172; 23 Ruling Case Law, 162. (2) The contract is certain as to time of delivery. Crowdus Drug Co. v. Nichols, supra; Atwood v. Cobb, 33 Mass., 227. (3) The price to be paid is definite and certain. Clement v. Drybread, 78 N. W., 235; Williston on Sales, 167; Hopkins v. Partridge, 71 Texas, 606; McConnell v. Hughes, 29 Wis., 537; McBridge v. Silverthorn, 1 Upper Canada (Q. B.), 545; Smith v. Duncan, 209 S. W., 140; Phifer v. Erwin, 6 S. E., 672; Luetkemeyer v. Murdock, 267 Fed., 158. (4) The time of payment is certain. Crowdus Drug Co. v. Nichols, supra.

The contract between the association and grower is a contract of purchase and sale. 35 Cyc., 27; Columbia Carriage Co. v. Hatch, 47 S. W., 288; Williams v. Drummond Tobacco Co., 44 S. W., 185; Texas Brewing Co. v. Anderson, 40 S. W., 737; Texas Brewing Co. v. Templeman, 38 S. W., 27.

Specific performance. Curtice Bros. v. Catts, 66 Atl., 935; Gloucester Isinglass Co. v. Russia Cement Co., 27 N. E., 1005; Great Lakes Co. v. Scranton Coal Co., 239 Fed., 603; City Ice Co. v. Easton Ice Co., 110 Atl., 350; White Marble Co. v. Consolidated Lumb. Co.,

172 N. W., 603; American Smelting Co. v. Bunker Hill Mining Co., 248 Fed., 172.

Continuous supervision. Livesley v. Johnson, 76 Pac., 946; American Smelting Co. v. Bunker Hill Mining Co., 248 Fed., 172; Texas Oil Co. v. Central Co., 194 Fed., 1; Union Pac. R. Co. v. Chicago R. Co., 163 U. S., 564.

*Farrar & Kemble,* and *Sharp & Livey,* for defendant in error.

We think the trial court and the court of Civil Appeals at Dallas held correctly that said contract was uncertain, vague and unilateral, and not susceptible of specific performance, and in support of the defendant's contentions and the rulings of the courts that have already passed upon these issues, we submit the following authorities: Texas Produce Exchange v. Sorrell, 168 S. W., 74; National Oil & Pipe Line Co. v. Teel, 95 Texas, 586; Lone Star Salt Co. v. Texas Short Line Ry. Co., 90 S. W., 863; Houston Elec. Co. v. Glen Park Co., 155 S. W., 965; Carrico v. Stevenson, 135 S. W., 260; Miller v. Chicago Portrait Co., 195 S. W., 619; Cold Blast Trans. Co. v. City Bolt & Nut Co., 114 Fed., 77; McDavid v. Phillips, 94 S. W., 1131; Watson v. Paddelford & Son, 221 S. W., 569; Pope Mfg. Co. v. Gormully, U. S., 36 L. Ed., 414; Watson v. Boswell, 61 S. W., 407; Loftus v. Maxey, 11 S. W., 272; Gillett v. Moody, 54 S. W., 35; Hill v. Brown, 237 S. W., 252.

With reference to whether or not the contract in controversy is one undertaking to create a monopoly and in restriction of trade by eliminating competition, etc., which would be in violation of the Constitution and Laws of the State of Texas, we submit for the consideration of this court the following authorities: Article 1, Section 26, Constitution of the State of Texas; Anti-Trust Statutes of Texas; Reeves v. Decorah Farmers' Co-operating Soc., 44 L. R. A. (N. S.), 1104, 140 N. W., 844; Ludowese v. Farmers' Mut Co-op. Co., 145 N. W., 475; United States v. King, 229 Fed., 275; Ford v. Chicago Milk Shippers' Assoc., 39 N. E., 651; Burns v. Wray Farmers' Grain Co., 176 Pac., 487.

Mr. Chief Justice CURETON delivered the opinion of the court.

This suit was instituted by the Texas Farm Bureau Cotton Association, a nonprofit co-operative agricultural association or corporation, organized under the Co-operative Marketing Act, Vernon's Texas Civil Statutes, 1922 Supplement, Articles 14½k to 14½yy. The purpose of the suit was to enjoin the defendant in error, Stovall, from delivering and selling his crop of cotton to parties other than the

plaintiff in error, in violation of a contract alleged to have been made with the Association, and to compel specific performance of this contract. On application for temporary injunction, the court after hearing the evidence sustained exceptions to the plaintiff in error's petition, and upon refusal to amend the cause was dismissed. An appeal was prosecuted to the Court of Civil Appeals for the Fifth District, which affirmed the judgment of the trial court. 248 S. W., 1109.

The plaintiff in error was organized by an organization committee, or "group of persons", composed of Mr. J. T. Orr and others, as contemplated by the statute, (Art. 14½m). This committee issued and caused to be circulated over the State a document called the "Texas Farm Bureau Cotton Growers' Co-operative Marketing Association Agreement", which for convenience we will refer to as the Grower's Application for Membership. This agreement was signed by some 20,000 cotton growers of the State, each grower signing a separate copy. Among others signing the instrument was the defendant in error, J. C. Stovall.

The agreement authorized the committee to obtain a charter when signatures thereto were obtained covering at least 500,000 bales of cotton. Signatures covering this number of bales were obtained. The committee then incorporated the plaintiff in error, mailed the defendant in error a certificate of membership, which was received and accepted, and he thereafter participated in the conduct of the association, to the extent at least of voting in the manner prescribed for by its Board of Directors. This agreement, signed by the defendant in error, contained as a part thereof the contract which will be hereafter set out, called the "Texas Farm Bureau Cotton Growers' Co-operative Association Marketing Agreement". The last named portion of the instrument was incorporated in the body of the original document signed by the defendant in error, and as such was a part of his application for membership.

This application contained a provision to the effect that the acceptance of the application for membership and the marketing agreement by the Association should be conclusive upon the mailing of the notice by the Association. It also contained a provision to the effect that the subscriber agrees to execute, when requested by the Association, a marketing agreement substantially the same as that set forth in the agreement hereafter copied, or, at the option of the Board of Directors, be bound by the terms of the agreement embraced in the application for membership. The record shows that when the corporation was chartered, it exercised the option to be bound by the association marketing agreement embraced in the original application, and that it notified defendant in error of this acceptance.

From the foregoing we conclude that defendant in error became a member of the Association, and the marketing agreement a contract between him and plaintiff in error. Belton Compress Co. v. Saunders, 70 Texas, 699; McCord v. Southwestern Sundries Co., 158 S. W., 226; Railway Co. v. Granger, 86 Texas, 350, 40 Am. St., 837, 24 S. W., 795; 10 Corpus Juris, §§ 753, 762, 766, 771, also §§ 289, 290, 291, 292, 296, 297.

The trial court found that the Association was duly organized, and after organization accepted defendant in error's application for membership, his association and marketing agreement, and duly notified him thereof; that he was producing cotton, refusing to deliver it to plaintiff in error, and selling and delivering it to others.

That court however, as a matter of law, concluded the temporary injunction should be refused "because the contract executed by defendant is unilateral, uncertain in terms, and therefore not susceptible of specific performance, and is subject to the twelfth and fourteenth special exceptions of defendant's answer.

The Court of Civil Appeals states that the effect of the order of the trial court sustaining the exceptions was substantially to hold that the contract hereafter quoted was unilateral, uncertain, was not a contract for purchase and sale, and that it did not purport to be a contract between plaintiff in error and defendant in error.

The contract in question reads as follows:

## "TEXAS FARM BUREAU COTTON GROWERS' CO-OPERATIVE ASSOCIATION MARKETING AGREEMENT.

"The Texas Farm Bureau Cotton Growers' Co-operative Marketing Association, a non-profit Association, with its principal office at Dallas, Texas, hereinafter called the Association, first party, and the undersigned Grower, second party agree:

"1. The Grower is a member of the Association and is helping to carry out the express aims of the Association for co-operative marketing, for minimizing speculation and waste and for stabilizing cotton markets in the interest of the grower and the public, through this and similar organizations undertaken by other growers.

"2. The Association agrees to buy and the Grower agrees to sell and deliver to the Association all the cotton produced or acquired by or for him in Texas during the years 1921, 1922, 1923, 1924, and 1925.

"3. The grower expressly warrants that he has not heretofore contracted to sell, market or deliver any of his said cotton to any person, firm or corporation, except as noted at the end of this agreement. Any cotton covered by such existing contracts shall be excluded from the terms hereof for the period and to the extent noted.

"4. (a). All cotton shall be delivered at the earliest reasonable time after ginning, to the order of the Association, at the warehouse con-

trolled by the Association, or at the nearest public warehouse, if the Association controls no warehouse in that immediate district; or by shipment as directed, to the Association and by delivery of the endorsed warehouse receipts or bills of lading properly directed.

"(b). Any deduction or allowance or loss that the Association may make or suffer on account of inferior grade, quality or condition at delivery, shall be charged against the grower individually.

"(c). The Association shall make rules and regulations and shall provide inspectors or graders or classifiers to standardize, grade and class the quality and method and manner of handling, pressing and shipping such cotton; and the Grower agrees to observe and perform any such rules and regulations and to accept the grading established by the Association, which shall be in accordance with the Official Cotton Standards of the United States.

"5a. The Association shall pool or mingle the cotton of the Grower with cotton of a like variety, grade and staple delivered by other growers. The Association shall classify the cotton and its classification shall be conclusive. Each pool shall be for a full season.

"5b. The Association will endeavor to sell the cotton gradually as the spinning industry requires it at the best possible price before another crop is produced, but in case prices are not satisfactory or production is greater than consumption, or there are abnormal trade or financial conditions, the Association will, in its discretion, hold such part of the cotton as may not be sold at a satisfactory price, until there is a fair demand for it.

"6. The Association agrees to resell such cotton, together with cotton of like variety, grade and staple, delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions; and to pay over the net amount received therefrom, (less freight, insurance and interest), as payment in full to the Grower and Growers named in contracts similar hereto, according to the cotton delivered by each of them, after deducting therefrom, within the discretion of the Association, the costs of maintaining the Association, organization fee and annual membership dues to the Texas Farm Bureau Federation, (unless otherwise paid), and costs of handling, grading and marketing such cotton; and of reserves for credits and other general purposes (said reserves not to exceed one per cent of the gross resale price). The annual surplus from such deductions must be prorated among the growers delivering cotton in that year on the basis of deliveries.

"7. The Grower agrees that the Asociation may handle, in its discretion, some of the cotton in one way and some in another; but the net proceeds of all cotton of like quality, grade and staple, less charge, costs and advances, shall be divided ratably among the Growers in

proportion to their deliveries to each pool, payments to be made from time to time until all the accounts of each pool are settled.

"8. The Association may sell the said cotton, within or.without this state, directly to spinners or exporters or otherwise, at such time and upon such conditions and terms as it may deem profitable, fair and advantageous to the Growers; and it may sell all or any part of the cotton to or through any agency now established or to be hereafter established, for the co-operative marketing of the cotton of growers in other states throughout the United States, under such conditions as will serve the joint interest of the growers and the public; and any proportionate expense connected therewith shall be deemed marketing costs under Paragraph 6.

"9. The Grower agrees that the Association shall borrow money in its name on the cotton, through drafts, acceptances, notes or otherwise, or on any warehouse receipt or bills of lading or upon any accounts for the sale of cotton or on any commercial paper delivered therefor. The Association shall prorate the money so received among the growers equitably, as it may determine, for each district and period of delivery.

"10. The Association may establish selling offices, warehouses, plants, marketing, statistical or other agencies in any place.

"11. The Grower shall have the right to stop growing cotton and to grow anything else at any time at his free discretion; but if he produces any cotton during the term hereof, it shall be included under the terms of this agreement and must be sold only to the Association.

"12. Nothing in this agreement shall be interpreted as compelling the Grower to deliver any specified quantity of cotton per year; but he shall deliver all the cotton produced or acquired by or for him.

"13(a). This agreement shall be binding upon the Grower as long as he produces cotton directly or indirectly, or has the legal right to exercise control of any commercial cotton or any interest therein during the term of this contract.

"(b). If this agreement is signed by the members of a co-partnership, it shall apply to them and each of them individually in the event of the dissolution or termination of the said co-partnership.

"(c). If the Grower places a crop mortgage upon any of his crops during the term hereof, the Association shall have the right to take delivery of his cotton and to pay off all or part of the crop mortgage for the account of the Grower and to charge the same against him individually. The Grower further agrees that if the mortgagee desires, he will execute in favor of the creditor an assignment of his interest in the cotton which he has sold, or will sell, to the Association for the protection of the creditor to the extent of the creditor's just claim, and the Association in turn agrees, upon notice of such

assignment, to respect the same and to pay to the creditor to the extent of his just claim the proceeds otherwise due the grower.

"The Grower shall notify the Association prior to making any crop mortgage; and the Association will advise the Grower in any such transactions.

"14. From time to time the Grower agrees to mail to the Association any statistical data requested, on the forms provided for that purpose by the Association.

"15. This agreement is one of a series generally similar in terms, comprising with all such agreements, signed by individual growers, or otherwise, one single contract between the Association and the said Growers, mutually and individually obligated under all the terms thereof. The Association shall be deemed to be acting in its own name, for all such growers, in any action or legal proceedings on or arising out of this contract.

"16(a). The Grower hereby expressly authorizes the Association to deliver to any warehousing corporation organized for co-operation with this Association, any or all of his cotton for handling, processing or storing; and to charge against his cotton the prorated costs of such services to his cotton and his prorated shares of the funds necessary to create a reserve, equivalent to one class of its preferred stock annually plus bonus, to retire the said class; and to pay the interest on advances and the dividends on all outstanding preferred stock.

"(b). The Grower shall not be charged for such deductions except on account of warehouses within his immediate district, as determined by the Association; and for such deductions the Grower shall receive a proportionate interest in such warehouses.

"17. If the Grower has on hand on July 1, 1921, any cotton of the 1920 or previous crops, free of liens and capable of delivery, he shall deliver such cotton to the Association as it may direct, to be graded by the Association and marketed by it in pools wholly separate from all other deliveries here made, but generally in the manner hereinabove set forth.

"18(a). Inasmuch as the remedy at law would be inadequate; and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the Association, should the Grower fail so to sell and deliver all of his cotton, the Grower hereby agrees to pay to the Association for all cotton delivered, sold, consigned, withheld or marketed by or for him, other than in accordance with the terms hereof, the sum of five cents per pound, middling basis, as liquidated damages for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all the growers to each and all of the said contracts.

"(b). The Grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of cotton, the Association shall be entitled to an injunction to prevent breach or further breach hereof and to a decree for specific performance hereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go to the open market and buy cotton to replace any which the Grower may fail to deliver.

"(c). If the Association brings any action whatsoever, by reason of a breach or a threatened breach hereof, the Grower agrees to pay to the Association all costs of court, costs for bonds and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fees expended or incurred by it in such proceedings; and all such costs and expenses shall be included in the judgment and shall be entitled to the benefits of any lien securing any payment thereunder."

The primary criticism of the defendant in error is that the above contract is lacking in mutuality of obligation, unilateral, and too uncertain to constitute a contract.

Our first inquiry will be directed to an examination of the contract with a view of determining these propositions.

Mutuality of obligation, as defined by a leading text, is as follows:

"Mutuality of contract consists in the obligation on each party to do, or to permit something to be done, in consideration of the act or promise of the other. Contracts lacking in mutuality are often termed unilaterial contracts. Mutuality of obligation is an essential element of every enforceable agreement. Mutuality is absent when one only of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only. And, conversely, a contract is not unilateral where is contains mutual obligations binding on both parties. Mutuality does not require that both engagements must be expressed in the same form, for one may be in writing and the other by parol. The benefits or liabilities of the parties need not be equal. It is sufficient that a consideration move to both parties, and mutual promises are not essential where a sufficient consideration is otherwise present. Where there are mutual promises between the parties, it is not necessary to render a particular promise by one party binding that there be a special promise on the part of the other party directed to that particular obligation. Where several persons are parties to a contract, some of its provisions may relate solely and separately to one of the parties, and others to another party, and some of the provisions may relate to each party and some to all jointly.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

"To show mutuality, the obligation may be implied as well as express. Although on its face and by its express terms the contract is obligatory on one party only, yet if the intention of the parties and the consideration on which the obligation is assumed is that there shall be a correlative obligation on the .other side the law will imply it. Hence the mere fact that a contract does not include an express promise to pay for services will not deprive it of mutuality, where the agreement to pay is a fair inference from the remaining terms of the contract; and likewise an agreement to employ or to serve may be implied. Further an obligation to sell may in some cases be implied where there is an obligation on the other part to purchase. And conversely, an agreement to purchase may be implied from an obligation to sell." (13 Corpus Juris, 331, 332, 333, 334); Texas Seed and Floral Co. v. Chicago Set and Seed Co., 187 S. W., 747, 750; Naylor v. Parker, 139 S. W., 93, 98.

Reduced to its last analysis, the rule is simply that a contract must be based upon a valid consideration, and that a contract in which there is no consideration moving from one party, or no obligation upon him, lacks mutuality, is unilateral, and unenforceable.

It is quite elementary that the promise of one party is a valid consideration for the promise of the other party. Elliott on Contracts, Vol. 1, §§ 229, 231; 13 Corpus Juris, p. 327, § 170; James v. Fulcrod, 5 Texas, 512, 519, 55 Am. Dec., 743; Flanders v. Wood, 83 Texas, 277, 280, 18 S. W., 572; Harness v. Luttrall, 225 S. W., 810; McCaskey v. McCall, 226 S. W., 432.

In this contract the plaintiff in error has made a number of binding p·  ·ises:

It agrees to buy all of the cotton produced by defendant in error for a period of five years, naming the years. (Par. 2).

By necessary implication under Paragraph 4 (a) of the contract, the Association agrees to accept delivery of the cotton at the earliest reasonable time after ginning.

The Association agrees to make rules and regulations, and provide inspectors or graders and classifiers to standardize, grade, and class the cotton. This, of course, was essential to proper marketing, not only of the particular cotton raised by defendant in error, but of the pools of cotton in which that grown by him was to be placed. (Par. 4(c).

Under Paragraph 5(a), quoted above, the Association agreed to pool the cotton of defendant in error with similar cotton of other growers. This promise was of direct financial benefit to defendant in error,· as enabling him to obtain whatever increase in price a sale of that character might bring. It was moreover of financial benefit to him, in that under the contract it enabled him to obtain a beneficial

interest in the net proceeds of all the cotton placed in the pool with his own.

Paragraph 5 (b) is a plain agreement on the part of the Association to make a reasonable effort to sell the cotton in the manner named at the best possible price. Texas Seed & Floral Co. v. Chicago Set & Seed Co., 187 S. W., 747, 750, (writ refused). This paragraph of the agreement was of direct financial interest to defendant in error, for the reason that the price he was to receive for his cotton was dependent upon the action of plaintiff in error in selling the cotton for the best possible price.

Paragraphs 6 and 7 are of direct financial value to defendant in error, and constitute a plain promise on the part of the Association to sell the cotton pools at the best price obtainable, and pay over the net proceeds therefrom to those from whom the cotton was purchased, in proportion to the amount of cotton delivered by each grower in the pools.

There are other promises of the Association in the agreement, but the above are sufficient for the purposes of this discussion.

Not only does the grower, the defendant in error in this case, obtain the promises of the Association as to the matters above named, but since it is plain that the cotton of himself and other growers is to be pooled with cotton similar in class, and that all growers, some 20,000 in this case, have agreed that it may be pooled, and that the payment for the cotton is to be from the net proceeds of the pools, it is evident that there moves a consideration, not only from plaintiff in error, but from each of the growers signing the contract, to the extent that each grower surrenders his exclusive beneficial interest in and dominion and control over his individual cotton, and obtains in lieu thereof a beneficial interest in the net proceeds of the pool in which his cotton may be placed.

We conclude, therefore, that the promises in the agreement are mutual, that there is an ample valid consideration, and that the contract is not subject to the criticism that it lacks in mutuality or is unilateral.

The next objection urged to the contract is that it is so uncertain in its terms as not to be capable of enforcement.

The contract in this case, in paragraphs 2, 11, and 12, as quoted above, makes definite and certain the subject matter. The grower agrees to sell, and the Association agrees to buy, *all* the cotton produced by the defendant in error or acquired by or for him in Texas, during the years 1921 to 1925, inclusive. This description of the subject matter is clearly sufficient and definite to form the basis of a contract. Hopkins v. Partridge, 71 Texas, 608, 10 S. W., 214; Brewer v. Blanton, 66 Texas, 532, 1 S. W., 572; Becker v. Bowen, 79 S. W., 45, 46; Staley v. Sumrell, 163 S. W., 697, 699; Crosby v. DeBord,

155 S. W., 647; Curtice Bros. v. Catts, 72 N. J. Eq., 831, 66 Atl., 935; Lapowski v. Taylor, 13 Texas Civ. App., 624, 35 S. W., 934; G. H. & H. R. Co. v. Hill Mercantile Co., 31 Texas Civ. App., 196, 71 S. W., 797; Simpkins on Contracts & Sales, pp. 819, 821; 13 Corpus Juris, pp. 339, 340, § 191 (13); Elliott on Contracts, Vol. 1, § 180.

The contract is sufficiently certain not only as to the time of delivery by defendant in error, but as to the time of the performance of all its terms by the plaintiff in error. The cotton is to be delivered by defendant in error at the earliest reasonable time after ginning, and, of course, is to be accepted by plaintiff in error at the same time. A reasonable time within which to make the delivery is definite. Elliott on Contracts, Vol. 1, § 176. By Paragraph 5(b) the Association is to sell the cotton before another crop is produced, with certain exceptions.

The text writers and cases next cited give many instances of contracts which did not fix precise dates for performance, yet were held or considered sufficiently definite: Elliott on Contracts, supra; Cowart v. Edwards, 4 Texas Civ. App., 276, 23 S. W., 569; Lange v. Caruthers, 70 Texas, 722, 8 S. W., 604; Wright v. Farmers Nat. Bank, 31 Texas Civ. App., 406, 72 S. W., 103.

We think this is sufficiently definite. However this may be, it is quite elementary that where the contract is silent as to the time of performance, the law implies that a reasonable time is meant. Elliott on Contracts, supra; Self v. King, 28 Texas, 552; Weaver & Starnes v. King, 98 S. W., 902; Hart v. Bullion, 48 Texas, 278, 289; Crowdus Drug Co. v. Nichols, 194 S. W., 484.

Paragraph 4 (a) of the contract fixes the place of delivery and acceptance of the cotton with reasonable certainty. This fulfills the requirements of the law. Elliott on Contracts, Vol. 1, § 177.

In so far as the payment of the money to defendant in error is concerned, where the contract does not specifically otherwise provide, the statute makes it certain by making the place of payment in the county of the domicile of the payor. R. S., Art. 1830.

We think the price to be paid under this contract is sufficiently definite and certain. The price is to be defendant in error's proportionate share of the net proceeds from the sale of the pool, or pools, in which his cotton may be placed. This is capable of ascertainment. Under the contract, the Association must resell the cotton. The amount obtained from this resale is to be determined, not by any further negotiations between the parties to the contract, but by external standards,—that is, market conditions. As soon as the pool has been sold, the gross proceeds become definite and certain. From these proceeds certain expenses are to be deducted. The deductions are named or specified in the contract, and may be easily ascertained. This method of determining the net proceeds of goods sold on consign-

ment or commission is a familiar one, and no reason has been given why it should not be used to ascertain the price of goods delivered under a contract providing therefor. The liberty of contract is not to be lightly restricted by the application of technical rules. Elliott on Contracts, Vol. 1, §§ 181, 184, and notes; Hopkins v. Partridge, 71 Texas, 606, 10 S. W., 214; Baker v. Gwinn, 4 Texas Civ. App., 539, 23 S. W., 604, 606; Smith v. Duncan, 209 S. W., 140; Clement v. Drybread, 108 Iowa, 701, 78 N. W., 235; Phifer v. Erwin, 100 N. C., 59, 6 S. E., 672; Luetkemyer v. Murdock, 267 Fed., 158; Hardwerk v. Oswood, 23 Ill. App., 282; McConnell v. Hughes, 29 Wis., 537.

Aside, however, from the question as to what courts may have held as to certainty of price where that subject was uncontrolled by statutory provisions, it is clear, we think, that this type of contract was expressly authorized by the Co-operative Marketing Act. Article 14½s, Vernon's Texas Statutes, 1922 Supplement. Since the statute itself authorizes the courts to enforce specific performance of this character of contract, and issue injunctions to prevent breaches thereof, it is not competent for courts, except upon grounds which admit of no reasonable doubt, to conclude that such a contract is too uncertain and indefinite as to price to be enforceable by the remedies prescribed.

We do not find it necessary to determine whether this contract was one of ordinary sale and purchase or an agency contract. The fact that the Association is created primarily for co-operative purposes, and not for profit, lends color to the theory that it is an agency contract. But when the statute is examined and the contract analyzed, it is quite plain that in its essential aspects the *contract* is not one of agency as that term is ordinarily understood. The rule is that the primary test as to the character of a contract is the intention of the parties. 23 R. C. L., p. 1216, § 34.

It is difficult to lay down any single rule or test as to what will or will not constitute a sale of property. The case next cited contains many annotations on the subject, but in reality each contract must be construed in accordance with its own terms and with the manifest intention of the parties. See D. M. Ferry & Co. v. Hall, L. R. A., 1917B, 620, and notes (188 Ala., 178). In general it may be said that if it is manifest from the contract that it was intended title should pass and the price be paid, the transaction constitutes a sale. According to the contract before us, the Association agrees to buy, and the grower agrees to sell and deliver cotton to the Association. (Par. 2). By Paragraph 18(b) of the agreement, "the parties agree that this is a contract for the purchase and sale of personal property." Other provisions in the contract show that it was the manifest purpose of the parties that the Association should take title to the cotton delivered to it, and that defendant in error should lose all dominion over it.

The cotton is to be delivered to the Association without any provision for its return; the Association is authorized to have the cotton handled, processed and stored; it is authorized to borrow money on, pool, and sell the cotton; in other words, the Association is authorized to exercise all acts of ownership over the cotton after its delivery, subject only to the method prescribed for determining its price.

The fact that the cotton is to be placed in a pool with the cotton of other growers, and the grower paid from the net proceeds of the pool, instead of from the net proceeds of his own cotton, clearly shows that the purpose was to pass title to the Association. It is true that the grower at all times has a beneficial interest in the net proceeds of this pool, but in so far as the legal title to the cotton is concerned, and his dominion over it, it is clear that passes from him. What remedies, if any, the grower might have, as against the cotton, in the event of a breach of the contract by the Association, it is unnecessary to determine. It is sufficient to say that, in view of the statute, and the express language of the agreement declaring the instrument a contract of sale and purchase, we must regard it as such a contract in so far as the parties here are concerned. See the following cases: Columbia Carriage Co. v. Hatch, 19 Texas Civ. App., 120, 47 S. W., 288; Williams v. Drummond Tobacco Co., 17 Texas Civ. App., 635, 44 S. W., 185; Texas Brewing Co. v. Anderson, 40 S. W., 737; Texas Brewing Co. v. Templeman, 90 Texas, 277, 38 S. W., 27. But irrespective of the classification which may be given the contract, since the statute expressly gives the Association remedies in equity to enforce the performance of contracts of this character, it is entitled to these remedies where the facts warrant.

It is insisted that this contract is unenforceable in equity at the suit of the Association, because of lack of mutuality of remedy. The contract before us was authorized by the statute which gives the Association the remedies of specific performance and injunction. Vernon's Civil Statutes, 1922 Supplement, Article 14-½s.

The statute having authorized these remedies, whatever may have been the rule in equity, the statute will control. R. S., Art. 4643; Summer v. Crawford, 91 Texas, 129, 41 S. W., 994; Lakeside Irr. Co. v. Kirby, 166 S. W., 715, 717, (writ refused); Sullivan v. Dooley, 31 S. W., 589, 73 S. W., 82, 84; Brown v. Staple Cotton Co-operative Assn., (96 So., 847) Supreme Court of Mississippi, decided June 4, 1923, and not yet reported.

Aside from the statute, the plaintiff in error, because of the contract and the nature of its business as a co-operative concern without capital stock, would be entitled to equitable relief. Oregon Growers Co-operative Assn. v. Lentz, 212 Pac., 811; Washington Cranberry Assn. v. Moore, 117 Wash., 430, 201 Pac., 773; Grant County Board

113 T. C.—19.

v. Allphin, 152 Ky., 280, 153 S. W., 417; Phez v. Salem Fruit Union, 103 Ore., 514, 201 Pac., 222; Owen County Society v. Brumback, 128 Ky., 137, 107 S. W., 710; Tobacco Growers Co-operative Assn. v. Jones, (Supreme Court of North Carolina, decided October, 1922, printed report (117 S. E., 174) not available).

The provision in the contract with reference to liquidated damages was authorized by the statute, and in no way militates against the conclusion reached. Elliott on Contracts, Vol. 3, Sec. 2311; Moss & Raley v. Wren, 118 S. W., 149; Lone Star Salt Co. v. Texas Short Line Ry. Co., 86 S. W., 355, 361; authorities supra.

While the grower might have and could maintain an action for damages for breach of contract, yet the fact that the Association has no capital stock and is purely co-operative, would, under ordinary circumstances render such an action ineffective or inadequate. Therefore, there is no lack of mutuality of remedies, for the reason that in the event of a breach of the contract by the Association, defendant in error would be entitled to relief in equity.

Again, plaintiff in error, although incorporated, belongs to that class of associations, ordinarily though not necessarily unincorporated, without capital stock, having members instead of stockholders, operated for some mutually beneficial purpose. That it belongs to this class of associations, will be seen by an examination of the statutes authorizing its creation. Vernon's Civil Statutes, 1922 Supplement, Articles 14-½pp to 14-½qq see generally 5 Corpus Juris, 1330, 1341, and 1352 to 1359.

The contract in this case was a part of defendant in error's membership application, and as a member he is entitled to have it performed. For the Association to decline to carry out this contract, would be tantamount to suspending or expelling him. It is elementary that one denied the benefits of membership of an association may appeal to a court of equity for redress. 5 Corpus Juris, pp. 1358, 1359; Pomeroy's Equity Jurisprudence (2d Ed.), Vol. 4, Secs. 1731, 1732, 1733.

The Court of Civil Appeals expresses the view that specific performance could not be awarded against a member, because it would necessarily require constant supervision of the court covering a long period of time, involving a series of acts, and because the court would be confronted with the possible problem of pursuing the party against whom the plea is made from place to place, etc. The answer to this is that the rule stated is a rule of decision, and not a limitation of the jurisdiction of a court of equity. Elliott on Contracts, Vol. 3, Sec. 2322. In addition, the statute has authorized the remedy, and the contract here involved is within the statute, which must control. Vernon's Texas Civil Statutes, 1922 Supplement, Article 14-½s. Besides, a court of equity would not meet with any very

serious difficulty in requiring the average owner to deliver his cotton after it was ginned.

What has been said necessarily disposes of all objections raised to the contract sued on.

For the various reasons assigned, we have concluded that none of the propositions urged against the enforcement of this contract are tenable, that the trial court erred in sustaining the exceptions to the plaintiff in error's petition, in holding that the contract was unilateral, uncertain in its terms, not susceptible of specific performance, and in dismissng the petition; and that the Court of Civil Appeals erred in affirming the judgment of the trial court.

The judgments of the Court of Civil Appeals and the District Court are both reversed, and the case remanded to the District Court with instructions to be governed by this opinion in any further proceedings in this cause.

*Reversed and remanded.*