## ANGLETON STATE BANK v. TEXAS HAY ASS'N et al. (No. 8764.)

(Court of Civil Appeals of Texas. Galveston. June 10, 1926. Rehearing Denied July 1, 1926.)

I. Sales ⬅️201(1), 212.

Grower's contract with hay association *held* only an agreement for purchase and sale of hay, under which title passed only on segregation for and delivery of hay to association.

2. Sales ⬅️201(1), 212.

Where, prior to levy of attachment on hay contracted for by hay association, there had been neither segregation nor delivery, as· required by contract, lien attached thereto.

Error from District Court, Brazoria County; M. S. Munson, Judge.

Attachment by the Angleton State Bank against J. W. Loper and others, wherein the

Texas Hay Association claimed the property attached. Judgment for claimant, and plaintiff brings error. Reversed and rendered.

Rucks & Enlow and Wilson & Follett, all of Angleton, for plaintiff in error.

Bryan, Dyess, Colgin & Suhr, of Houston, for defendants in error.

GRAVES, J. A sufficient statement, adopted by the defendants in error, is thus made in the brief for plaintiff in error:

"This is an appeal from a judgment rendered by the district court of Brazoria county, Tex., in a statutory trial of right of property suit, involving the title to 220 tons of prairie hay. On December 8, 1922, a writ of attachment was issued in a suit styled 'Angleton State Bank v. J. W. Loper, Mrs. M. A. Loper, and J. M. Turner, No. 17594,' pending in the district court of Brazoria county, Tex., directing the sheriff or any constable of Brazoria county, Tex., to forthwith attach so much of the property of the defendants named in the writ as should be of value sufficient to make the sum of $1,233 and costs of suit. The writ was placed in the hands of the sheriff of Brazoria county, Tex., and was by him executed on December 12, 1922, by levying the writ upon 220 tons of prairie hay as being the property of J. M. Turner.

"On February 8, 1923, defendant in error made and presented to the sheriff its written affidavit claiming the above-mentioned hay, and at the same time made and presented to the sheriff its bond, with Hartford Accident & Indemnity Company as surety, in the sum of $4,840, the sheriff having valued the hay at $2,420, which bond was duly approved by the sheriff. On February 10, 1923, the sheriff, by virtue of such affidavit and bond, delivered the hay to defendant in error.

"The suit between the parties hereto having been docketed in the name of plaintiff in error, with defendant in error as defendant, thereafter the parties made up the issues between them, in writing, as follows:

"Plaintiff in error alleged the issuance of the writ of attachment, the levying of same on the hay, the execution and presentation by defendant in error of the bond and affidavit, the value placed by the sheriff on the hay, and the delivery of the hay, under and by virtue of the affidavit and bond, to defendant in error. Plaintiff in error further alleged that, at the time the writ of attachment was levied on the hay, J. M. Turner was the owner of and in possession thereof, and that by virtue of the levy plaintiff in error acquired an attachment lien upon the hay, and thereby became entitled to subject the hay and the proceeds thereof to the payment of its debt against Turner. Plaintiff in error further alleged that its attachment lien was prior and superior to any right, claim, or title of defendant in error, and prayed for judgment against defendant in error, and the surety on its bond, for the amount of its claim against J. M. Turner, together with ten per cent. damages, and costs of suit.

"Defendant in error alleged: That J. M. Turner was a member of the Texas Hay Association and a stockholder thereof; that the Texas Hay Association was and is a co-operative marketing association, organized and chartered under the laws of the state of Texas; that, at the time Turner became a member of the Texas Hay Association, he made and entered into a contract in writing with the association, wherein he bargained, sold, and conveyed to the association all of the hay grown or to be grown, made or to be made, saved or to be saved, and stored and to be stored, or in any manner acquired by him during the years 1921, 1922, and 1923; that under this contract in writing the title to the hay, when same was made and stored by Turner, passed to the association; that the hay embraced in this litigation was stored by Turner in his warehouse on his farm; that same was declared by Turner to the association; and that the association advanced thereon to him the sum of $3,900.97, and became the exclusive owner of all right, title, and interest in the hay, with the right to sell same and to account to Turner therefor at the average net sale price of all hay of similar grade and quality contained in the pool for the year 1921, 1922, or 1923, which same has been duly and truly accounted for by such association, and which has been accepted by Turner. Defendant in error prays that plaintiff in error take nothing by its suit, and that its title to the hay be in all things confirmed by the judgment of the court.

"Trial was had before the court, resulting, on September 29, 1924, in judgment in favor of defendant in error. The suit is now properly before this honorable court for review."

In this court, as was done below, the bank contends that at the time the attachment was levied J. M. Turner was the owner of and in possession of the hay, which made it subject to the writ, while the hay association asserts that it was then the owner and in possession thereof, and for that reason the levy got the bank nowhere. The determination of that issue is all the appeal involves.

The bank advances three grounds for its position that the title to Turner's hay had not then passed to the association: (1) The hay grown and stored in his barn by Turner was a mingled and undivided portion of a large mass or bulk of hay, in which others in like manner were interested with him, no part thereof having been segregated or otherwise identified, as being his particular part. (2) He had not, pursuant to the terms of his contract with the hay association, segregated or otherwise identified, from the whole of what he had produced and stored, the several portions he intended to reserve for his own use and to sell to his neighbors. (3) No such delivery of the hay as was required under his contract with the association had been made by him.

The undisputed evidence showed:

(1) That J. M. Turner, who was a member of the hay association for that year under the written contract between them, through Joe Oswald, made and stored in his own barn near Chenango, Tex., 590 tons of hay out of the 1921 crop; Oswald had an undivided one-fifth interest in it with him, and it was mingled in his barn with other hay belonging

severally to his son and another person, the son having possession of the barn containing all the hay. Turner had in February before sold some of 590 tons, but on December 12, 1922, there was a residue of this hay, so stored and mixed with that belonging to others, of between 200 and 300 tons, and on such balance, while still in the barn, the writ was levied on that date. He had drawn advances of $3 per ton from the hay association under their contract along as he put the hay in his barn, turning over to Oswald one-fifth thereof, his practice in that respect having been to draw at that rate for 100 tons whenever he made that much or more, but there was each time an overplus left on which he had received no advances, this in the first instance amounting to 14 tons. Finally, however, the association had not desired him to ship some of the hay because it had spoiled, which left him in the attitude of having drawn the $3 on a little more hay than he shipped, but the high price obtained by the association for what he did ship left it owing him $73. He had also reserved some of his hay, the particular amount not being disclosed, for his own use and to sell to his neighbors, which he had the right, unrestricted as to quantity or otherwise, to do under his contract with the association.

(2) That Turner and the hay association, during 1921, made a contract in writing, the main provisions of which were these:

"(2) The association agrees to buy and the maker agrees to sell and deliver to the association all of the hay produced or acquired by him or for him in Texas during the years 1921, 1922, 1923, 1924, and 1925.

"(3) The maker expressly warrants that he has not heretofore contracted to sell, market, or deliver any of his hay to any person, firm, or corporation, except as noted at the end of this agreement. * * *

"(4) (a) All hay shall be delivered, at the earliest reasonable time after making, to the order of the association, at the warehouse controlled by the association, or at the nearest public warehouse, if the association controls no warehouse in that immediate district, or by shipment as directed to the association, and by delivery of the indorsed warehouse receipts or bills of lading properly directed. * * *

"(5) (a) The association shall pool or mingle the hay of the maker with hay of a like variety and grade delivered by other makers. The association shall classify the hay, and its classification shall be conclusive. Each pool shall be for a full season.

"(b) The association will endeavor to sell the hay gradually as the market requires it, at the best possible price, before another crop is produced; but, in case prices are not satisfactory, or production is greater than consumption, or there are abnormal trade or financial conditions, the association will, in its discretion, hold such part of the hay as may not be sold at a satisfactory price until there is a fair demand for it.

"(6) The association agrees to resell such hay, together with hay of like variety and grade, delivered by other makers under similar contracts, at the best prices obtainable by it under market conditions, and to pay over the net amount received therefrom (less freight, insurance, and interest), as payment in full to the maker and makers named in contracts similar hereto, according to the hay delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of maintaining the association, and annual membership dues to the Texas Farm Bureau Federation, $10 (unless otherwise paid), and costs of handling, grading, and marketing hay, and of reserves for credits and other general purposes (said reserves not to exceed 1 per cent. of the gross resale price). The annual surplus from such deductions must be prorated among the makers delivering hay in that year on the basis of deliveries.

"(7) The maker agrees that the association may handle, in its discretion, some of the hay in one way and some in another; but the net proceeds of all hay of like quality, grade, less charges, costs, and advances, shall be delivered ratably among the makers in proportion to their deliveries to each pool, payments to be made from time to time until all the accounts of each pool are settled.

"(8) The association may sell the said hay at such time and upon such conditions and terms as it may deem profitable, fair, and advantageous to the makers; and it may sell all or any part of the hay to or through any agency, now established or to be hereafter established, for the co-operative marketing of the hay of makers in other states throughout the United States, under such conditions as will serve the joint interest of the makers and the public, and any proportionate expense connected therewith shall be deemed marketing costs under paragraph 6.

"(9) The maker agrees that the association shall borrow money in its name on the hay, through drafts, acceptances, notes, or otherwise, or on any warehouse receipt or bills of lading, or upon any accounts for the sale of hay, or on any commercial paper delivered therefor. The association shall prorate the money so received among the makers equitably as it may determine, for each district and period of delivery. * * *

"(11) The maker shall have the right to stop making hay and to grow anything else at any time at his free discretion; but, if he produces any hay during the term hereof, it shall all be included under the terms of this agreement, and must be sold only to the association.

"(12) Nothing in this agreement shall be interpreted as compelling the maker to deliver any specific quantity of hay per year; but he shall deliver all the hay produced or acquired by or for him, save such as he may use or sell to his neighbors for their use.

"(13) * * * (c) If the maker places a crop mortgage upon any of his crops during the term hereof, the association shall have the right to take delivery of his hay, and to pay off all or part of the crop mortgage for the account of the maker, and to charge the same against him individually. The maker further agrees that, if the mortgagee desires, he will execute in favor of the creditor an assignment of his interest in the hay which he has sold, or will sell, to the association for the protection of the creditor to the extent of the creditor's

just claim, and the association in turn agrees, upon notice of such assignment, to respect the same, and to pay to the creditor, to the extent of his claim, the proceeds otherwise due the maker.

"The maker shall notify the association·prior to making any crop mortgage, and the association will advise the maker in any such transaction. * · * *

"(16) (a) The maker hereby expressly authorizes the association to deliver, to any warehousing corporation organized for co-operation with this association, any or all of his hay for handling or storing, and to charge against his hay the prorated costs of such services to his hay and his prorated shares of the funds necessary to create a reserve, equivalent to one class of its preferred stock annually, plus bonus, to retire the said class, and to pay the interest on advances and the dividends on all outstanding preferred stock. * * *

"(18) (a) * * * Should the maker fail so to sell and deliver all of his hay, the maker hereby agrees to pay to the association for all hay delivered, sold, consigned, withheld, or marketed by or for him, other than in accordance with the terms hereof, the sum of $3 per ton, as liquidated damages for the breach of this contract. * * *

"(b) * * * And the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions, and that the buyer cannot go to the open market and buy hay to replace any which the maker may fail to deliver."

[1] Our construction of this contract between Turner and the hay association, if even that much may be said of it, is that it amounts at most to an agreement for the purchase and sale of the hay, under which the title should pass only on the segregation for and delivery of the hay to the association, and that that is in effect what the parties themselves meant in this declaration in the ₋before quoted paragraph 18 (b) thereof:

"And the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions, and that the buyer cannot go to the open markets and buy hay to replace any which the maker may fail to deliver."

The same construction seems to us to have been put by our Supreme Court on a very similar contract to the one here involved—that is, one of a co-operative marketing association with reference to cotton—in the case of Texas, etc., Ass'n v. Stovall, 113 Tex. 273, 253 S. W. 1101, where by implication at least it was held that the title of the grower to the cotton he was to sell and deliver did not pass to the association until after delivery. In the annotation to the case of Tobacco Ass'n v. Jones, 33 A. L. R. at page 253, the effect of the holding in the Stovall Case is stated:

"Where a contract contains, among others, a provision that the contract is for the purchase and sale of personal property, and other provisions show that it was the manifest purpose of

the parties that the association should take title to the cotton delivered to it, and that the grower should lose all dominion over it, the contract is one of sale, and title passes upon delivery. Texas Farm Bureau Cotton Ass'n v. Stovall (1923) 113 Tex. 273, 253 S. W. 1101."

It is no answer to this interpretation, as to what the contracting parties intended to and did agree upon, to say, as the defendant in error does, that it purchased in advance all the hay Turner might produce, with title thereto vesting in it at once upon the hay's coming into existence, because that is not the purport or effect of their written agreement; as before pointed out, he had under its terms the unrestricted right, not only to use such of it as he desired himself, and his principal business was farming and making hay, but also to sell any part or all of it to his neighbors. Furthermore, his right to place a "crop mortgage" upon the whole of it while it was still growing is plainly recognized, a thing he could not do if the property were not his own.

[2] Under the undisputed evidence, as our statement of facts has shown, there was, prior to the levy of the attachment, neither a segregation and appropriation of Turner's hay by, nor a delivery of it as provided in the contract to, the association; hence the title thereto had not at that time passed out of him, and the lien the writ imposed attached as of that date.

From these conclusions, it follows that the trial court's judgment must be reversed, and that judgment should here be rendered in favor of plaintiff in error against the defendant in error and the surety on its claimant's bond, Hartford Accident & Indemnity Company, for $1,356.30, together with legal interest thereon from February 9, 1923, until paid; it has accordingly been so ordered.

Reversed and rendered.