## LONG v. TEXAS FARM BUREAU COTTON ASS'N.  (No. 11274.)

(Court of Civil Appeals of Texas. Fort Worth. Jan. 31, 1925. Rehearing Denied March 28, 1925.)

**Agriculture ⬤═6—Under lease by member of co-operative cotton association, member's share held subject to marketing agreement.**

Where a member of a co-operative cotton association, organized under Co-operative Marketing Act (Vernon's Ann. Civ. St. Supp. 1922, arts. 14½k–14½yy), rented his land on share rent under agreement that tenant might dispose of crop and deposit member's share of proceeds in bank to member's account, member's share *held* subject to marketing agreement requiring member to sell to association all cotton ·of which he had legal right to exercise control, since legal title to his share was vested primarily in him.

Appeal from District Court, Nolan County; W. P. Leslie, Judge.

Suit by the Texas Farm Bureau Cotton Association against C. E. Long, in which a temporary injunction was granted against defendant. From judgment on motion to dissolve injunction, defendant appeals. Affirmed.

Beall, Beall & Beall, of Sweetwater, for appellant.

Douthit, Mays & Perkins, of Sweetwater, C. K. Bullard, of Dallas, and Aaron Sapiro, of Chicago, Ill., for appellee.

DUNKLIN, J. In the year 1921, the Thirty-Seventh Legislature passed an act (Acts 1921, chapter 22) known as the "Co-operative Marketing Act," which appears in Vernon's Ann. Civ. St. Supp. 1922, chapter 7A. The first section of the act (Vernon's Ann. Civ. St. Supp. 1922, art. 14½k) reads as follows:

"In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products, this act is passed."

Section 3 of the act (article 14½l) is as follows:

"Five or more persons engaged in the production of agricultural products may form a nonprofit, co-operative association, with or without capital stock, under the provisions of this act."

Section 4 (article 14½ll) reads:

"An association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members, or with the harvesting, preserving, drying, processing, canning, packing, storing, handling, shipping, or utilization thereof, or the manufacturing or marketing of the by-products thereof; or in connection with the manufacturing, selling or supplying to its members of machinery, equipment or supplies; or in the financing of the above enumerated activities; or in any one or more of the activities specified herein."

The Texas Farm Bureau Cotton Association, with its principal place of business at Dallas, Tex., was organized and incorporated under and by virtue of the provisions of that act as a "nonprofit co-operative marketing association."

The association instituted this suit against C. E. Long. In its petition, after alleging its organization and incorporation, it further alleged that the defendant became a member of the association by executing an association agreement in writing, which included a marketing agreement reading, in part, as follows:

"Sec. 2. The association agrees to buy and the grower agrees to sell and deliver to the association all of the cotton produced or acquired by or for him in Texas during the years 1921, 1922, 1923, 1924, and 1925."

"Sec. 12. Nothing in this agreement shall be interpreted as compelling the grower to deliver any specified quantity of cotton per year; but he shall deliver all the cotton produced or acquired by or for him.

"Sec. 13(a). This agreement shall be binding upon the grower as long as he produces cotton directly or indirectly, or has the legal right to exercise control of any commercial cotton or any interest therein during the term of this contract."

It was further alleged that during the years 1922 and 1923 the defendant breached said marketing agreement by selling to some person or persons other than the plaintiff 22,500 pounds of cotton, equal to or better than middling grade, all of which cotton was produced or acquired by or for the defendant.

The association and marketing agreement was attached to and made a part of the petition and marked "Exhibit A." The petition concluded with a prayer for a decree requiring of defendant specific performance of his marketing agreement, and to that end that he be enjoined from selling any cotton produced by or for him during the life of the contract to any person other than plaintiff. Plaintiff also prayed for judgment in the sum of $1,225 as liquidated damages for the breach of the contract by defendant in selling his crops for the years 1922 and 1923, and also for $250 attorney's fee, and $100 as traveling expenses for such attorney. The claims for such damages were based upon stipulations in the marketing agreement signed by the defendant that he would pay as liquidated damages five cents per pound for all cotton sold by him in violation of the agreement, and also attorney's

fees and traveling expenses in the amount claimed, in the event of a recovery by plaintiff in any suit filed by it against the defendant.

Plaintiff's petition was duly verified, and on the same day it was filed the judge of the district court in which it was filed granted a temporary writ of injunction restraining the defendant "from selling, delivering, consigning or otherwise disposing of all or any part of the cotton produced or acquired by or for him during the years 1924 and 1925, to any person or persons other than plaintiff herein," conditioned upon the filing by the plaintiff of a bond to be approved by the clerk of the court. The writ of injunction so ordered was duly issued and served upon the defendant.

Two days later, the defendants filed an answer to the merits of the petition which also included a motion to dissolve the writ of injunction. Thereafter, the plaintiff filed a reply to defendant's answer, which included a general demurrer to its sufficiency, and upon a hearing of all the pleadings the court sustained a general demurrer to the defendant's motion to dissolve. From that order the defendant has prosecuted this appeal.

In the plaintiff's petition, it was alleged that the association agreement, embodying also the marketing agreement, which was executed by the defendant, was one of a series identical in terms which was signed by all independent growers who became members of the plaintiff corporation, all of which members were and are growers of cotton; that the value of the agreement lies in its co-operative character; and that the failure of the growers of cotton to sell and deliver their cotton to the plaintiff in accordance with the terms of their agreement would defeat and destroy the very purpose for which the corporation was formed, to wit, to realize higher prices by the proposed plan of collective bargaining.

It was further alleged in the petition that by reason of defendant's failure to comply with his marketing agreement, plaintiff had been unable to sell the amount of cotton it was organized to handle, and was thus seriously handicapped in the performance of its agreement with other members to prevent manipulation of the price of cotton by speculators, to the loss of the other members of the association and at a greater cost to them for marketing, in that thereby the defendant failed to contribute his pro rata part of the cost of such marketing. It was further alleged that the failure of defendant to comply with his agreement had encouraged other members of the association likewise to breach their agreements of like character, and that by reason of the terms of its agreement plaintiff was debarred from going into the market to buy other cotton to take the place of the amount which the defend-

ant had failed to deliver during the years 1922 and 1923.

The answer, which contained allegations of fact made the bases of the motion to dissolve the injunction, was duly verified. In that answer the defendant alleged:

"That for the years 1923 and 1924 he rented farm lands to tenants on the usual rental terms of one-third and one-fourth; that is, one-third of the feed and one-fourth of the cotton, and partly on the halves, wherein he furnished teams, feed, seed and tools, then he was to receive one-half of the cash value of the farm products raised by such tenants.

"That in making said rental contracts, it was specifically and definitely agreed and understood between defendant and his tenants, as was defendant's custom and was the usual custom of the community in such contracts, that the tenants were to plant, cultivate, gather, gin and market the cotton grown by them upon his premises, and to deposit of the cash proceeds of said cotton so sold by the tenants in the bank to defendant's credit the one-fourth or one-half, as the case might be, of such cash realized for said cotton as rents to defendant. Defendant shows in this connection that he was to have nothing whatever to do with the handling of the cotton, he would not claim the ownership of the cotton or any part thereof, and that such cotton so raised by defendant's tenants would be owned, managed and controlled by the tenants as above stated until converted by sale into cash, and defendant was to receive his part of the cash as rents for his premises, as above stated.

"Defendant shows that in making said rental contracts, same were by the year; that is, annual contracts, and in parol; and that at no time has the defendant had, owned or been in possession of any of the cotton so produced by said tenants, has not assumed any management or control or the handling thereof, and has in keeping with his part of the contract with said tenants waited for the sale of the cotton by the tenant and the delivery of his rents therefor as a deposit to his account in the Roscoe State Bank of Roscoe, Tex."

There were other allegations in the answer to the effect that the defendant had made unsuccessful attempts to induce his tenants to deliver the cotton grown by them on the land rented from the defendant to the plaintiff association, and that in renting the land upon those terms, and with the agreement that the tenants should sell all the cotton grown by them and divide the profits with the defendant, he had no intention of violating the contract with plaintiff association, and that he was induced to make that arrangement in lieu of growing the cotton himself by reason of the fact that he was crippled, having but one hand, and was growing old. By reason of the rental of the land upon the terms noted, the defendant specifically denied that he had produced any cotton directly or indirectly during the years 1922 and 1923, and also specifically denied that he had any legal right

to exercise control over the cotton raised by his tenants or any interest therein during those years.

The question to be determined on this appeal, as stated in appellee's brief, is:

"Whether a member of the association, who has leased his land on terms that the tenant dispose of the crop and deposit the landlord's share of the proceeds in a bank to the landlord's account, has, within the terms of the marketing agreement, 'produced cotton directly or indirectly, or has the legal right to exercise control of any commercial cotton or any interest therein.'"

The marketing agreement did not prohibit the defendant from renting his land, and the only cotton in issue in this suit is that portion to which the defendant was entitled under the rental contract made with his tenants, set out in his answer and noted above, and which consisted of one-fourth of the cotton grown by the tenants at their own expense and one-half of that grown with teams, seed, feed, and tools furnished by defendant. Under such rental contract, the legal title to one-fourth or one-half of the cotton so grown was, primarily to say the least, in the defendant, and clearly that portion of the cotton was produced indirectly by him as much so as if it had been produced by employees working for daily wages; the only difference being that in this case the tenant producing the same was compensated for his services by the use of the land for the purpose of realizing for his own benefit the remainder of the crop grown. The fact that the tenant was by agreement with the landlord authorized and empowered to sell the landlord's interest did not convey title to the tenant to that interest. Manifestly, such a sale would be for the defendant's account and not for that of the tenant. Furthermore, the title to one-fourth or one-half, as the case might be, being primarily vested in the landlord, he had the right to exercise control over it, and that right was recognized by both himself and the tenant, as evidenced by their agreement that the tenant should sell it for the landlord's account. It cannot be doubted that authority to the tenant to sell the landlord's portion of the cotton, made for the first time after the cotton was grown, would have been a violation of the marketing agreement with the plaintiff; and we perceive no reason why a conclusion to the contrary would follow merely by reason of the fact that the authority to so sell such interest was vested in the tenant at the time the rental contract was entered into with the landlord.

For the reasons noted, we conclude that the facts alleged in the defendant's answer did not have the legal effect invoked by him to negative the verified allegations in plaintiff's petition that the defendant had breached the marketing agreement by selling cotton produced by him during the years 1922 and 1923. The purposes for which the association was organized depended for their accomplishment upon faithful observance of the terms of the marketing agreement by all of the members, as specifically stipulated in the agreement, and a grower cannot be permitted to evade his obligation by the indirect method resorted to by the defendant in this case, even though he in good faith believed that the method so adopted was not in violation of that agreement.

That the accomplishment of the purposes expressed in the Co-operative Marketing Act, passed by the Legislature of this state, is of vital interest to growers of crops, and therefore is of public importance, is evidenced by the enactment of laws of substantially the same import by the Congress of the United States (the Capper Volstead Act [U. S. Comp. St. Ann. Supp. 1923, §§ 8716½, 8716½a]), and by the Legislatures of two-thirds of the states. And many decisions may be found sustaining their validity as against attacks on constitutional grounds, including Texas Farm Bureau Ass'n v. Stovall, 113 Tex. 273, 253 S. W. 1101, by the Supreme Court of this state, and other cases cited in the opinion of the Supreme Court of Tennessee in Dark Tobacco Growers Co-operative Ass'n v. Dunn, 150 Tenn. 614, 266 S. W. 308, which opinion gives much valuable information relative to the history of such legislation and its importance as an economic necessity.

In Feagin v. Dark Tobacco Growers Co-operative Ass'n, 202 Ky. 801, 261 S. W. 607, the Court of Appeals of Kentucky held that the marketing agreement will include crops grown by a tenant, who is not a member of the association, if he has notice that his landlord is such a member. And in Kansas Wheat Growers Ass'n v. Floyd, 116 Kan. 522, 227 P. 336, Redford & Garrison v. Burley Tobacco Growers Co-operative Ass'n, 205 Ky. 515, 266 S. W. 24, and Dark Tobacco Growers Co-operative Ass'n v. Dunn, above, it was held that the marketing agreement will take precedence over a mortgage of crops, if the mortgagee has notice at the time it is taken that the mortgagor is a member of the association and a party to such marketing agreement.

The right of the plaintiff to the temporary writ of injunction issued in this case was given by section 17 of the Co-operative Marketing Act (Vernon's Ann. Civ. St. Supp. 1922, art. 14½s) and also by the marketing agreement upon which plaintiff's suit was based.

Accordingly, the order of the trial court refusing to dissolve the temporary writ of injunction theretofore issued restraining the defendant from further breaching the marketing agreement is sustained, and the judgment is affirmed.