**TEXAS FARM BUREAU COTTON ASS'N v. KYLE.   (No. 3119.)**

(Court of Civil Appeals of Texas. Texarkana. Feb. 11, 1926.)

**1. Agriculture ⬡⚏6—Under lease by member of co-operative cotton association, providing tenants should pay rents for land cultivated in cotton in portion of crop, member's share held subject to marketing agreement (Acts 37th Leg. [1921], c. 22 [Vernon's Ann. Civ. St. Supp. 1922, arts. 14½k–14½yy]).**

Agreement by which member of co-operative cotton association, organized under Co-operative Marketing Act (Acts 37th Leg. [1921], c. 22 [Vernon's Ann. Civ. St. Supp. 1922, arts. 14½k–14½yy]), rented his land on share rent, requiring tenants to pay their rent for land cultivated in cotton in a portion of the crop, held subject to marketing agreement requiring member to sell to association all cotton produced or acquired by him during certain years, since tenants could have tendered cotton in payment of rent or members could have demanded a portion of their crops.

**2. Agriculture ⬡⚏6—Signing of marketing contract held practical construction by member of rental contracts with tenants, as giving him such interest in crops as would enable him to deliver cotton to association.**

Where member of co-operative cotton association signed marketing contract at time when crops of cotton were not far from maturity, thereby impliedly representing himself as a grower, and agreeing to deliver cotton grown by him directly or indirectly during year mentioned therein, held practical construction of his rental contracts with his tenants as giving him such an interest in crops to be grown on premises as would enable him to deliver cotton to association under marketing agreement.

**3. Appeal and error ⬡⚏1177(5)—Where trial court should have directed verdict for appellant, but evidence does not enable appellate court to render judgment for any particular amount, judgment will be reversed and cause remanded.**

Where trial court should have directed verdict for appellant, leaving to the jury only the amount, but evidence does not enable appellate court to render judgment for any particular amount, judgment will be reversed and cause remanded.

Appeal from District Court, Bowie County; Hugh Carney, Judge.

Suit by the Texas Farm Bureau Cotton Association against V. L. Kyle. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

C. K. Bullard, of Dallas, Aaron Sapiro, of Chicago, Ill., Johnson & Waters, of New Boston, and Keeney & Dalby, of Texarkana, for appellant.

King, Mahaffey & Wheeler, of Texarkana, for appellee.

HODGES, J. The appellant is a nonprofit association, incorporated by authority of an act passed in 1921 by the Thirty-Seventh Legislature (Acts 37th Leg. c. 22 [Vernon's Ann. Civ. St. Supp. 1922, arts. 14½–14½yy]). It is composed of an association of cotton growers, formed for the purpose of marketing cotton at the best obtainable prices. In order to carry out its purpose, the association enters into contracts with growers by which it agrees to buy and the grower agrees to sell and deliver to the association all of the cotton produced or acquired by him or for him (the grower) in Texas during the years 1921, 1922, 1923, 1924, and 1925. The

association binds itself to endeavor to sell the cotton gradually as the spinning industry requires it, or at the best possible price before another crop is produced. There are many other stipulations embraced in such contracts, which need not here be mentioned. The contract also provides that, should the grower fail to sell and deliver all of his cotton to the association, he shall pay to the association for all cotton delivered, sold, consigned, withheld, or marketed by or for him, other than in accordance with the terms of his agreement, the sum of 5 cents per pound, middling basis, as liquidated damages for the breach of his contract; and further agrees that, in the event of a breach, or a threatened breach, by him of any provision regarding the delivery of cotton, the association shall be entitled to an injunction to prevent the breach, or further breach, of the contract. He agrees also that, in the event the association brings any action whatsoever by reason of the breach or threatened breach of the contract, he shall pay to the association all costs of court, costs for bonds and otherwise, expenses of travel, and all expenses arising out of or caused by the litigation, and any reasonable attorney's fees expended or incurred by the association in such proceeding.

The appellee owns a farm consisting of approximately 500 acres, situated in Bowie county. On June 28, 1921, he signed one of the contracts above referred to, by which he agreed to deliver to the association all cotton grown by him or for him during the years previously mentioned. He failed to deliver any cotton at any time to the association, and this suit was filed in the district court of Bowie county by the association to recover damages, attorney's fees, and expenses aggregating the sum of $5,100.

The appellee pleaded as a defense that he did not produce, directly or indirectly, any cotton during the years 1921, 1922, 1923, or 1924 which he was required to deliver to the association under his contract. The court submitted two special issues, in response to which the jury found that the appellee had not produced, directly or indirectly, any cotton during the years 1921 or 1922, and that the appellee did not during those years have control over any commercial cotton, or any interest therein, which he was required by his contract to deliver to the appellant. The remaining issues of fact were determined by the court.

The appellant requested a peremptory instruction in its favor. It also requested the court to set aside the findings made by the jury and render judgment in its favor. The contention on this appeal is that, under the uncontradicted evidence a judgment should have been entered against the appellee upon all the issues of fact.

The evidence consisted of the testimony of the appellee and his tenants. This, in substance, showed that most of appellee's farm was planted in cotton during the years 1921 to 1924, inclusive. The land was cultivated by tenants, who paid as rent one-third of the grain and one-fourth of the cotton when the tenant furnished the teams and tools. When the landlord furnished the teams and tools, the tenants paid one-half of the crops. The appellee testified that about one-third of the land was cultivated by share croppers; that is, those who paid one-half, and the other by tenants who paid one-third and one-fourth. There was grown on the premises during the four years above mentioned something over 400 bales of cotton. In the course of his examination, he stated:

"I have cultivated that place ever since 1910. I cultivated it by tenants in 1921. Some of them worked on third and fourth, and some of them were half hands. I couldn't say how much cotton was raised on that place by tenants in 1921. I haven't kept up with it. I expect there was as much as 100 bales in 1921. The cotton was marketed at Hooks. All the hands that raised it saw to the sale of it. I helped get buyers for it. As to the negroes there on the place, they never sold without seeing me, and I never sold without seeing them about it. We worked together in selling it. * * * The contract I made with those half tenants that rented in 1922 was that they were to do the work and I to furnish the teams and tools, and they were to get half the money. They were to sell the cotton when they got ready, and leave my money in the bank. They have always taken the tickets to the bank, and the cashier figured it up and left my part there. The cashier always did the dividing. That was the contract I always made. My contract with third and fourth croppers was that they were to leave the fourth dollar in the bank. They were to give the tickets to the cashier, and he was to divide it. They always sold their own cotton. They just paid me one-fourth of the cotton. There was never any agreement between me and any man that worked on my place that I was to have one-half of the cotton. I have always taken one-half of the cotton. I have always taken one-half of the cotton, and they would not have it any other way. You could hardly divide it fairly because maybe one bale was big and the other a little one, and one bale a good middling and the other a low middling. I was to have my part of the cotton as rent. I never did take any of the tenants' cotton and sell it without their consent. I always asked, and talked with them about it. Whenever they got ready to sell, we would get in the car and drive it to Hooks. Sometimes they would have the buyers go down there and look it over, and maybe be a week or two in selling it."

Again he said:

"I had that same contract with the tenants when I signed this marketing agreement. Of course, I always had the cashier to deduct whatever the hands owed me out of the proceeds of the cotton. I always had the orders for the cashier to handle it in the way I have mentioned."

The evidence further showed that during the years 1923 and 1924 the appellee had made a contract by which he leased about 400 acres of his land to his brother, who had it worked upon practically the same terms as those which the appellee himself had adopted in previous years. The contract with his brother provided for a cash rental of $2,500 per year, payable on or before November 15 of each year, to be paid out of the money derived from the sale of the first cotton sold each year. In addition to furnishing the land, appellee, as the lessor, agreed to supply his brother with 8 mules. or horses and all wagons, tools, etc., necessary for use in cultivating the land. He retained a lien upon all crops grown on the land, to secure the payment of the rental.

Appellant contends that the rental contract between the appellee and his brother covering the years 1923 and 1924 was a collusive undertaking to evade the obligations of his contract to deliver cotton grown on the premises; and the facts tend strongly to support that charge.

Precisely the same character of a growers' contract, in a controversy strikingly similar, was involved in the cases of Long v. Texas Farm Bureau Cotton Association, 270 S. W. 561, decided by the Court of Civil Appeals at Fort Worth (not yet [officially] published), and Main v. Texas Farm Bureau Cotton Association, 271 S. W. 178, decided by the Court of Civil Appeals at Amarillo (not yet [officially] published). In each case it was held that the grower was liable for the nondelivery of cotton grown by his tenants under similar contracts. In the Long Case the court said:

"Under such rental contract, the legal title to one-fourth or one-half of the cotton so grown was, primarily, to say the least, in the defendant [the landlord], and clearly that portion of the cotton was produced indirectly by him as much so as if it had been produced by employees working for daily wages; the only difference being that in this case the tenant producing the same was compensated for his services by the use of the land for the purpose of realizing for his own benefit the remainder of the crop grown. The fact that the tenant was by agreement with the landlord authorized and empowered to sell the landlord's interest did not convey title to the tenant to that interest. Manifestly, such a sale would be for the defendant's account and not for that of the tenant. Furthermore, the title to one-fourth or one-half, as the case might be, being primarily vested in the landlord, he had the right to exercise control over it, and that right was recognized by both himself and the tenant, as evidenced by their agreement that the tenant should sell it for the landlord's account. It cannot be doubted that authority to the tenant to sell the landlord's portion of the cotton, made for the first time after the cotton was grown, would have been a violation of the marketing agreement with the plaintiff; and we perceive no reason why a conclusion to the contrary would follow merely by reason of the fact that the authority to so sell such interest was vested in the tenant at the time the rental contract was entered into with the landlord."

In the Main Case, the court said:

"The evidence in the case shows that the defendant had a number of tenants who raised cotton during the years named above. The contract between the defendant and such tenants provided that he, as landlord, should receive one-fourth of the cotton raised or produced by them, and that the tenants should sell the cotton and pay him his one-fourth in money. The evidence discloses that this authority given to the tenant to sell the cotton and pay the landlord his one-fourth in money was given after the execution of the marketing contract, but this, under our holding, is probably immaterial. The contract by defendant with his tenants was not what is known as a money rent contract—a contract stipulating certain money rent, regardless of the crop raised—but is a part-crop contract in which the rent received is to be measured by one-fourth of the crop produced. The landlord's interest was in the crop, and the fact that he authorized his tenant to sell his part and give him the money does not change the status of that interest. Certainly the landlord's interest in the crop was interest 'produced or acquired by or for him,' and the sale by the tenant was only the act of an agent."

The court then quotes approvingly from the Long Case above cited.

[1] It conclusively appears from the testimony of the appellee, and those of his tenants who testified on the trial, that the rental contracts provided that the tenants should pay their rents for the land cultivated in cotton in a portion of the crop. Under such contracts the tenants could have tendered cotton in payment of rents, or the landlord could have demanded a portion of the crops. Doubtless he did get a portion of the grain raised on the farm. The agreement for the cotton to be sold and the money divided was only a convenient method of dividing the crops.

[2] There is another fact disclosed by the evidence, too significant to be disregarded. The appellee signed this marketing contract on June 28, 1921, at a time when it is well known that crops of cotton are in an advanced stage of growth and not far from maturity. Evidently the appellee had previously made his rental contracts with his tenants for that year. The evidence shows that the rental contracts for that year were practically the same as those for the next year, and the same as those under which his brother farmed the premises during the years 1923 and 1924. In signing the agreement the appellee impliedly represented himself as a grower, and agreed to deliver cotton grown by him directly or indirectly during the year 1921. The logical inference from that act is that he himself construed his rental contracts with his tenants as giving him such an interest in the crops to be grown on the premises as would enable him to deliver cot-

ton to the association under the marketing agreement.

In addition to the cases above cited, the following support the contention of the appellant: Louisiana Farm Bureau Cotton Ass'n v. Banister (La.) —— So. ——,[1] not yet [officially] published; Coyle v. Dark Tobacco Growers' Co-op. Ass'n, 277 S. W. 318, 211 Ky. 162; Oregon, etc., Ass'n v. Lentz, 212 P. 811, 107 Or. 561; Feagain v. Dark Tobacco Growers' Co-op. Ass'n, 261 S. W. 607, 202 Ky. 801; Sparks v. Ponder, 94 S. W. 428, 42 Tex. Civ. App. 431; Jaco v. W. A. Nash & Co. (Tex. Civ. App.) 236 S. W. 237.

[3] We are of the opinion that the court should have directed a verdict for the appellant, leaving to the jury only the amount. But the state of the evidence is not such as to enable us to render judgment for any particular amount.

The judgment of the trial court will therefore be reversed, and the cause remanded for another trial.