**LENNOX et al. v. TEXAS COTTON CO-OP. ASS'N.**

No. 1605—5997.

Commission of Appeals of Texas, Section A. Dec. 22, 1932.

Lennox & Lennox, of Clarksville, and Wm. Hodges and King, Mahaffey, Wheeler & Bryson, all of Texarkana, for plaintiffs in error.

C. K. Bullard, of Dallas, Robbins & Bailey, of Clarksville, and Long & Wortham, of Paris, for defendant in error.

SHARP, J.

This cause has been pending in the courts many years and prior to this appeal has been before the appellate courts many times. Texas Farm Bureau Cotton Ass'n v. Lennox (Tex. Civ. App.) 257 S. W. 935; Id. (Civ. App.) 283 S. W. 619; Id. (Civ. App.) 296 S. W. 328; Id. (Civ. App.) 16 S.W.(2d) 413. For convenience, except as may be stated in this opinion, we will refer to Lennox & Lennox as plaintiffs and the Texas Cotton Co-Operative Association as defendant, as they were designated in the trial court. The judgment from which the instant appeal was prosecuted was based on the plaintiffs' second amended original petition filed May 22, 1930, the defendant's fifth amended original answer and cross-bill filed on May 22, 1930, plaintiffs' second amended supplemental petition filed on May 23, 1930, and the defendant's first amended third supplemental answer filed on May 23, 1930.

The trial court instructed the jury to return a verdict in defendant's favor on its cross-action for $37,783.17 as liquidated damages it was entitled to recover by virtue of a written marketing contract, for $782.99 as expenses it had incurred and for $7,500 as attorney's fees; the court further instructed the jury to find against the defendant as to its cross-action for a specific performance of the contract; and then submitted to the jury special issues in response to which they made certain findings described in the opinion of the Court of Civil Appeals from which we quote as follows (37 S.W.(2d) 331, 335):

"(1) That the oral contract was made as alleged by appellees. (2) That appellant violated the provisions of said contract when it sold the 1,095 bales of cotton as it did. (3) That the $101,107.54 for which appellant claimed it sold the 1,095 bales was a less sum than it would have received therefor if it had exercised proper care and complied with the terms of the contract in selling the cotton. (4) That, by exercising such care, appellant could have sold the cotton for $21,960.90 more than the $101,107.54 it reported it sold same for. (5) That, in accounting to appellees, appellant was entitled to deduct $9,407.05 from the amount the cotton sold for. (6) That appellees were restrained from selling 877,032 pounds of cotton from August 31, 1925, when the writ of injunction was issued out of the district court, to March 28, 1929, when said writ was dissolved. (7) That appellees were restrained from selling 818,863 pounds of cotton from September 18, 1929, when the writ of injunction was issued out of the Supreme Court, to October 23, 1929, when said writ was dissolved. (8) That the price of cotton was lower March 28, 1929, than it was August 31, 1925. (9) The cotton appellees were restrained from selling had declined 7½ cents a pound March 28, 1929, from the highest price obtainable after the writ of injunction was issued August 31, 1925. (10) The market price of cotton declined 2 cents per pound from September 19, 1929, to October 23, 1929. (11) Appellees were damaged in the sum of $82,154.60 by reason of the decline in the market price of cotton August 31, 1925, and the market price thereof October 23, 1929. (12) Appellees exercised proper care in the preservation of the cotton they were restrained from selling. (13) In exercising such care appellees expended $11,823.65 for storage of the cotton. (14) Such expenditure was reasonable in amount. (15) Appellees exercised due care in having the cotton insured. (16) They expended $23,961.10 for such insurance. (17) And the amount so expended was reasonable. (18) But for the injunction appellees could have sold the cotton they were enjoined from selling on the market at Clarksville during the gathering season of 1925–26 for $219,258. (19) While stored in the warehouse at Clarksville, the cotton lost 5 pounds per bale. (20) The average price per pound of cotton appellees were enjoined from selling on the Clarksville market March 28, 1929, was 17.5 cents. (21) Appellees were damaged by being deprived of the use of the cotton by the issuance of the writs of injunction. (22) Such damage amounted to $43,851.60. (23) There was a decline in the price of the cotton appellees were enjoined by the Supreme Court from selling between September 18, 1929, and October 23, 1929. (24) The 1,095 bales of the 1919, 1920, and 1921 crops were sold by appellant on actual samples taken from the bales. (25) The 1,095 bales when sold by appellant did not bring their reasonable cash market value. (26) The 1,095 bales were stored, segregated, classed and graded separate and apart from all other cotton of the defendant association. (27) And same was sold in pools separate and apart to themselves. (28) The contract between appellant and appellees required the former to consult the latter and obtain their consent before selling the 1,095 bales of cotton. (29) The freight per bale on the 1,095 bales from Clarksville to Houston in 1922 was $3.89. (30) The reasonable and customary insurance charge at Houston 'per $60.00 valuation on such cotton (the 1,095 bales) was 18 cents.' (31) The 'reasonable and customary storage charge, per bale, on such cotton during the year 1922' was '25½ per month.' (32) The First National Bank of Clarksville 'had a verbal mortgage or verbal lien' on appellees' 'cotton of the 1925 year crop before the issuance of the injunction herein on August 31, 1925.' (33) Warehouse receipts against appellees' 'cotton of the 1925 year crop were in the hands of the First National Bank and being held by it as security for the indebtedness of the plaintiffs (appellees) at the time of the issuance of the writ of injunction herein on August 31, 1925.' (34) Of the cotton held under warehouse receipts 35,000 pounds had been sold. (35) The amount appellant sold the 1,095 bales for, less the freight, insurance, storage, and interest on money it had advanced to appellees, was paid to them by appellant.

"On said findings of the jury and findings made by the court himself 'on undisputed facts,' he said, the court rendered judgment in appellees' favor for $160,845.11, the difference, the court determined, between the amounts found in their favor and the amounts found in appellant's favor."

The defendant appealed to the Court of Civil Appeals at Texarkana and by a divided court it was held that the trial court was correct in instructing the jury to return a verdict in favor of the defendant for the sums of $37,783.15, $7,500, and $782.99, a total of $46,066.14. As to the other items, the Court of Civil Appeals reversed and rendered judgment in favor of the defendant for $13,442.94, the difference between $32,623.20, the amount awarded plaintiffs on account of the breach of the contract by defendant, and $46,066.14, the amount awarded defendant as liquidated damages, etc. That part of the judgment denying specific performance of the contract in favor of the defendant was not disturbed and final judgment rendered in favor of the defendant against plaintiffs for the sum of $13,442.94. 37 S.W.(2d) 331. We refer to the various opinions rendered on former appeals for a more detailed statement of the case. Plaintiffs, Lennox & Lennox, bring the cause to the Supreme Court by writ of error.

This suit involves the construction of chapter 8, title 93, articles 5737 to 5764, enacted in 1921, and commonly known as the Co-operative Marketing Act (R. C. S. 1925) under which the Texas Farm Bureau Cotton Association was created, and the general marketing contract executed. In 1930 it changed its name to the Texas Co-Operative Marketing Association in which name it now appears in this suit. In article 5737 the policy of the law is stated that "in order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products, this law is passed." In article 5740 the purposes for which the act was enacted are declared and it provides that "an association may be organized to engage in any activity in connection with the marketing or selling of the agricultural products of its members. * * * " In article 5742 the powers of the association are set forth, among other things, as follows: "(a) To engage in any activity in connection with the marketing, selling, * * * storing, handling or utilization of any agricultural products produced or delivered to it by its members. * * * No association, however, shall handle the agricultural products of any non-member. * * * (c) To act as the agent or representative of any member or members in any of the above mentioned activities. * * * (g) To do each and every thing necessary, suitable or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the objects herein enumerated; or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged; and in addition, any other rights, powers and privileges granted by the laws of this State to ordinary corporations, except such as are inconsistent with the express provisions of this Act; and to do any such thing anywhere." The act further provides who may become members of the association (article 5743); how the association may incorporate (article 5744); for the adoption of by-laws (article 5746); the election of directors (article 5748), and other steps necessary to govern and control the association in its operations.

In article 5753 it is provided that "the association and its members may make and execute marketing contracts, requiring the members to sell, for a period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association. The contract may provide that the association may sell or resell the products of its members, with or without taking title thereto; and pay over to its members the resale price, after deducting all necessary selling, overhead and other costs and expenses, including interest on preferred stock, not exceeding eight per cent per annum, and reserves for retiring the stock, if any, and other proper reserves. * * * The by-laws and the marketing contract may fix, as liquidating damages, specific sums to be paid by the member or stockholder to the association upon the breach by him of any provisions of the marketing contract regarding the sale or delivery or withholding of products; and may further provide that the member will pay all costs, premiums for bonds, expenses and fees in case any action is brought upon the contract by the association; and any such provisions shall be valid and enforceable in the courts of this State. In the event of any breach or threatened breach of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract and to a decree of specific performance thereof. Pending the adjudication of such an action and upon filing a verified complaint showing the breach or threatened breach, and upon filing a sufficient bond, the association shall be entitled to a temporary restraining order and preliminary injunction against the member."

On or about June 30, 1921, Lennox & Lennox, who were partners in the practice of law and jointly interested in the growing of cotton through tenants on land which they jointly owned, signed a written agreement for the purpose of forming a marketing association under the provisions of the foregoing act. The pertinent parts of that agreement are as follows:

"The undersigned propose to organize a non-profit association, without capital stock, under the laws of the State of Texas for the purpose of promoting, fostering and encouraging the business of producing and marketing cotton co-operatively; for reducing speculation; for stabilizing the cotton markets; for co-operatively and collectively handling the problems of cotton growers; and for other pertinent purposes.

"We, the undersigned, in consideration of the premises and of our mutual undertakings and of the agreement of each and every other party hereto, do hereby agree as follows, each for himself and collectively for the express benefit of and as the Association to be organized:

"1. We will become members of the Texas Farm Bureau Cotton Growers' Co-Operative Marketing Association, a non-profit associa-

tion, without capital stock, to be organized under the laws of the State of Texas.

"2. The Association may include in its membership any cotton grower in Texas, or the landlord or tenant or lessor or lessee of land in Texas on which cotton is grown, provided the landlord or lessor receives all or part of the rental in cotton."

The agreement further reads: "Growers Lennox & Lennox as Joint tenants, Postoffice Address Clarksville, Texas."

The testimony further shows that, after the execution of the contract or agreement, Lennox & Lennox conducted their principal farming operations upon land which they owned jointly and operated in the same manner as they did before the signing of the agreement. The cotton which they failed to deliver to the association, and which the trial court held should have been delivered, was grown upon the lands owned jointly by them and under the same joint arrangements between themselves which existed during the year 1920 and for many years prior thereto.

■Plaintiffs contend that, by reason of signing of the contract by them as joint tenants, they did not become members of the association and were not bound by the terms of the contract as partners.

The almost unanimous demand for the enactment of co-operative marketing association laws and the current events with respect to the urge for the passage of legislation to promote prosperity in agricultural pursuits is well known to the courts. Nearly every state in the Union enacted co-operative marketing statutes substantially like the one under review. To the same purpose Congress enacted the Clayton Act, October 15, 1914, chap. 323, 38 Stat. at L. 730; the Capper-Volstead Act, February 18, 1922, chap. 57, 42 Stat. at L. 388, U. S. C., title 7, §§ 291, 292 (7 USCA. §§ 291, 292); and the Co-operative Marketing Act of July 2, 1926, chap. 725, 44 Stat. at L. 802, U. S. C., title 7, § 414—1 et seq. (Mason's), 7 USCA §§ 451–457. These marketing acts have been given a liberal construction by the courts in order to accomplish the purposes for which they were enacted. See Liberty Warehouse Co. v. Burley T. G. Co-Op. Ass'n, 276 U. S. 71, 48 S. Ct. 291, 72 L. Ed. 473, and the cases cited and referred to in the footnotes.

We have carefully read the statute involved here in the light of the history of this legislation and the construction given statutes similar in principle by both federal and state courts and we find nothing in the act to prohibit the association from contracting with its members, as was done here, and Lennox & Lennox by reason of their acts became members of the association and are bound by the terms of their agreement. This precise form of agreement and contract and the foregoing act was upheld by our Supreme Court in the case of Texas Farm Bureau Cotton Association v. Stovall, 113 Tex. 273, 253 S. W. 1101. In that opinion the contract is more fully set out and we refer to same.

■ It is also contended by Lennox & Lennox that the act in question violates our anti-trust laws. Article 5762 explicitly provides: "No association organized hereunder shall be deemed to be a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition or fix prices arbitrarily; nor shall the marketing contracts or agreements between the association and its members nor any agreements authorized in this chapter, be considered illegal or in restraint of trade."

The Congress of the United States passed similar acts with like purposes. See the Capper-Volstead Act, supra; Co-operative Marketing Act, etc., supra. Thus it will be seen that the Legislature and Congress have definitely declared it to be the public policy that associations organized under the Co-operative Marketing Acts do not contravene the anti-trust laws. These acts have been construed by the various courts and it is held that they do not violate the anti-trust laws. Hollingsworth v. Texas Hay Association (Tex. Civ. App.) 246 S. W. 1068, writ denied; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-Operative Association, supra. In the Stovall Case, supra, the point was raised that the act and contract violated the anti-trust laws, and, while the Supreme Court did not discuss this precise question in its opinion, the question was passed upon and by inference overruled. These statutes rest upon the broad ground that the Legislature and Congress approved the plan for protecting producers, stabilizing prices for their products, eliminating waste, and advancing the public interest.

■ To carry out the purposes for which the association was organized, a contract was entered into by and between the association and its members. It was to be a mutual obligation. The members obligated themselves to do certain things and the association likewise obligated itself to perform certain services. In order to make more efficient its services to its members, the law provided that no association shall handle the agricultural products of any nonmember. The marketing agreement referred to, and which was embraced in the agreement signed by the members, among other things, contains the following:

"2. The Association agrees to buy and the Grower agrees to sell and deliver to the Association all of the cotton produced or acquired by or for him in Texas during the years 1921, 1922, 1923, 1924 and 1925. * * *

"17. If the Grower has on hand on July 1, 1921, any cotton of the 1920 or previous crops, free of liens and capable of delivery,

he shall deliver such cotton to the Association as it may direct, to be graded by the Association and marketed by it in pools wholly separate from all other deliveries here made, but generally in the manner hereinabove set forth.

"18. (a) Inasmuch as the remedy at law would be inadequate; and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the Association, should the Grower fail so to sell, and deliver all of his cotton, the Grower hereby agrees to pay to the Association for all cotton delivered, sold, consigned, withheld or marketed by or for him, other than in accordance with the terms hereof, the. sum of five cents per pound, middling basis, as liquidated damages for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all the growers to each and all of the said contracts.

."(b) The Grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of cotton, the Association shall be entitled to an injunction to prevent breach or further breach hereof and to a decree for specific performance hereof, and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go to the open markets and buy cotton to replace any which the Grower may fail to deliver.

"(c) If the Association brings any action whatsoever, by reason of a breach or threatened breach hereof, the Grower agrees to pay to the Association all costs of court, costs for bonds and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fees expended or incurred by it in such proceedings; and all such costs and expenses shall be included in the judgment and shall be entitled to the benefits of any lien securing any payment thereunder."

In view of the very nature of the business undertaken by the association and its members, it was necessary that some binding contract or agreement be entered into defining their respective obligations. The question for decision here is: Are the provisions of the contract binding upon the association and the members? We think they have a reasonable relation to a proper purpose as contemplated by the act and the contract executed by the parties, and the provisions thereof are binding. Texas Farm Bureau Cotton Ass'n v. Stovall, supra; Hollingsworth v. Texas Hay Ass'n, supra; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Ass'n, supra.

By the terms of the contract, the association agreed to buy and the growers agreed to sell and deliver to the association all the cotton produced or acquired by or for them in Texas during the years 1921, 1922, 1923, 1924, and 1925. The contract further provides that the growers expressly warrant that they have not heretofore contracted to sell, market, or deliver any of said cotton to any person, firm, or corporation, except as noted at the end of the agreement (see section 3 of the contract). No exception was noted by Lennox & Lennox at the end of the contract.

▪ Nor can the act and contract be condemned because it is provided that the association, in the event of any breach or threatened breach of such marketing contract by a member of the association, shall be entitled to an injunction to prevent further breach of the contract and to a decree of specific performance. Both the act and contract definitely provide for such remedy and these provisions of the act and agreement have been repeatedly upheld. Texas Farm Bureau Cotton Ass'n v. Stovall, supra; Hollingsworth v. Texas Hay Ass'n, supra; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-Operative Ass'n, supra.

▪ By force of the act and contract, the association, if the grower fails to sell and deliver all of his cotton as he agreed to do, or in the event of any breach or threatened breach of such marketing contract by a member, shall be entitled to an injunction to prevent the breach of the contract and to a decree of a specific performance, and, in addition thereto, the association is entitled to recover from the grower the sum of 5 cents per pound, middling basis, as liquidated damages for the breach of his contract for all cotton delivered, sold, consigned, withheld, or marketed by or for him other than in the terms stated in the contract. The dealings Lennox & Lennox had with the association were as members and not as outsiders. Whatever contract they had with the association in respect of the 1,095 bales of cotton will be considered in that light. If the association was negligent in handling the 1,095 bales of cotton intrusted to its hands, then it would be responsible therefor. The trial court allowed them the sum of $32,623.20 for such negligence. Under the terms of the contract, the association was entitled to 5 cents per pound, middling basis, as liquidated damages on all cotton not delivered to it by the growers produced and acquired by them during the years 1921, 1922, 1923, 1924, and 1925. The trial court entered judgment for this item in favor of the association, excluding the cotton produced or acquired by Lennox & Lennox during the year 1925 subject to the terms of the contract, in the sum of $37,783.18, together with the expenses incurred and attorney's fees, a total of $46,066.14. We have already stated the other

548

amounts awarded Lennox & Lennox in the judgment and same will not be repeated here.

But the growers contend that, by reason of the injunction issued on August 21, 1925, which prevented them from selling 1,664 bales of cotton of the 1925 crop, they are entitled to damages therefor. That injunction restrained the growers "from selling, delivering, consigning or otherwise disposing of all or any part of the cotton produced or acquired by it for them and each of them during the year 1925, to any person or persons other than defendants herein." If the growers were not complying with their contract or threatened to breach its provisions,. the association was entitled to the injunction above stated. The growers certainly could not claim damages for cotton held by them not described in the writ of injunction. The. order embraced the language of the contract signed by Lennox & Lennox.

■ On September 18, 1929, the Supreme Court, on application of the association, granted a writ of injunction restraining the growers "from selling, consigning, marketing or otherwise disposing" of 1,664 bales of cotton then "in storage in a warehouse in Clarksville, Red River County, Texas." This writ was dissolved by the Supreme Court on October 23, 1929. On the trial it appeared that there were 1,559 bales of cotton instead of 1,664 bales in the warehouse. It is contended that between September 18, 1929, when the writ was granted, and October 23, 1929, when the writ was dissolved, the price of cotton fluctuated 2 cents per pound, and that the growers are entitled to damages for that amount.

` As grounds for this claim, the growers contend that they were indebted to a bank for a large sum of money which was secured by a verbal lien and by warehouse receipts or certificates issued on the cotton and delivered to the bank, and for that reason the cotton produced or acquired by them during the year 1925 was not subject to the terms of the contract. The Honorable Court of Civil Appeals in rendering its opinion in this cause, reported in 16 S.W.(2d) 413, 422 (writ denied) held in effect: (a) That by reason of the agreement or contract Lennox & Lennox became members of the cotton association. (b) It was conceded that Lennox & Lennox failed to ship their cotton in accordance with the terms of the marketing contract and were liable for the damages awarded in the trial below if that contract was binding on them. (c) Although members of the association by mortgaging rent cotton to a bank for borrowed money and thus placing it beyond their control, might render a suit for specific performance by association under the contract an inappropriate remedy, it would be no defense to action for damages for breach of the contract. (d) The bank, furnishing money used by the landlord in making advances and in purchasing cotton from their tenants and holding negotiable warehouse receipts issued as the cotton was purchased and stored, occupied the status of a mortgagee in possession. (e) Where members of the cotton association borrowed money from a bank for use in making advances and in purchasing cotton from their tenants, and transferred to the bank negotiable warehouse receipts issued as cotton was purchased and stored, the cotton so purchased and held was not within the marketing contract, so as to authorize suit for a specific performance by the association. (f) That the remedy of specific performance is never applicable where there is no obligation to perform. (g) That part of the judgment which awarded damages against Lennox & Lennox for the failure to deliver cotton grown and acquired by them during the years 1922, 1923, and 1924 will not be disturbed; but the order directing Lennox & Lennox to specifically perform by delivery of the 1,664 bales of cotton in the warehouse and perpetuating the injunction will be set aside and the injunction dissolved. We quote from the opinion of the Court of Civil Appeals giving the reasons for denying a specific performance of a contract and dissolving the injunction as follows:

"According to the testimony of the appellants, they borrowed the money for which the entire 1,664 bales of cotton were mortgaged because they did not have sufficient funds to make the advances to their tenants and to purchase their tenants' interest in the cotton in the fall of the year. There is nothing in the record to indicate that appellants are now financially able to pay that debt and redeem the cotton without a sale of the mortgaged cotton. They are therefore in a position where they cannot comply with the order of the court requiring an immediate and unconditional delivery of all the cotton in the warehouse to the association. 'Since a court of equity will not do a useless thing or make a nugatory decree, specific performance will not, as a rule, be decreed against a vendor who is unable for want of title to comply with his contract; and this is true, although the want of title is caused by the defendant's own act, as by his conveyance to a bona fide purchaser.' 25 R. C. L. p. 245, and cases referred to. The principle there announced would justify the court in refusing to direct the specific performance of any of the cotton incumbered with a mortgage and in possession of the mortgagee. The practical inability of the appellants to obey such an order would warrant a refusal to make the order. However, that situation would not exempt the appellants from liability for damages in failing to deliver cotton which was subject to the terms of their contract."

The contract also contains the following provisions:

"(c) If the Grower places a crop mortgage upon any of his crops during the term hereof, the Association shall have the right to take delivery of his cotton and to pay off all or part of the crop mortgage for the account of the Grower and to charge the same against him individually. The Grower further agrees that if the mortgagee desires, he will execute in favor of the creditor an assignment of his interest in the cotton which he has sold, or will sell, to the Association for the protection of the creditor to the extent of the creditor's just claim, and the Association in turn agrees, upon notice of such assignment, to respect the same and to pay to the creditor to the extent of his just claim the proceeds otherwise due the Grower.

"The Grower shall notify the Association prior to making any crop mortgage; and the Association will advise the Grower in any such transactions."

It is conceded that whatever mortgage the bank had on the 1,559 bales of cotton was oral and that the association had no notice of any such mortgage until after the issuance of its injunction in 1925. It is undisputed that C. D. Lennox was president and H. H. Lennox vice president of the bank claiming the verbal mortgage against the cotton in controversy, that the bank was never and is not now a party to the suit or to any of the injunctive proceedings, and it has never asserted in this cause any rights claimed by virtue of being the mortgagee of this cotton. The contract expressly provides that the growers must notify and advise with the association before entering into any such transaction, and, if after such conference a mortgage should be executed, then the association should have certain rights as to its payment. This clause of the contract has been sustained. Texas Hay Ass'n v. Angleton State Bank (Tex. Com. App.) 291 S. W. 846; see, also, Long v. Texas Farm Bureau Cotton Ass'n (Tex. Civ. App.) 270 S. W. 561, at page 563; Dark Tobacco Growers' Co-op. Ass'n v. Dunn, 150 Tenn. 614, 266 S. W. 308; Feagain v. Dark Tobacco Growers' Co-Op. Ass'n, 202 Ky. 801, 261 S. W. 607; Kansas Wheat Growers' Ass'n v. Floyd, 116 Kan. 522, 227 P. 336; Kansas Wheat Growers' Ass'n v. Leslie, 126 Kan. 694, 271 P. 284; Kansas Wheat Growers' Ass'n v. Ast, 118 Kan. 247, 234 P. 963; Kansas Wheat Growers' Ass'n v. Loehr, 118 Kan. 248, 234 P. 962; Redford & Garrison v. Burley Tobacco Growers' Ass'n, 205 Ky. 515, 266 S. W. 24. The very purposes for which the association was created may not be thwarted by the members thereof evading the vital provisions of the marketing contract in such a way as would render the contract unenforceable and a nullity.

If the 1,559 bales was cotton produced or acquired by Lennox & Lennox jointly, it was cotton they were obligated by their contract to deliver to the association and they were not entitled to recover damages because of the injunction issued restraining them from disposing of the cotton. If all or any part of the 1,559 bales was cotton not produced or acquired by Lennox & Lennox by virtue of their contract with the association, then on account of the language used in the injunction issued by the Supreme Court they will be entitled under proper pleadings to recover the damages sustained by them for restraining that part of the cotton not embraced within their contract.

We therefore recommend that both the judgments of the Court of Civil Appeals and of the district court be reversed and this cause remanded to the district court for trial in accordance with the following instructions: If the pleadings and proof should show that all or any part of the 1,559 bales of cotton was produced or acquired by Lennox & Lennox during the year 1925 as would bring it under the terms of the contract made by them with the cotton association, then the association would be entitled to recover 5 cents per pound, middling basis, as liquidated damages for failure to deliver such cotton to the association. On the contrary, if it should be shown that all or any part of the 1,559 bales of cotton was not produced or acquired by Lennox & Lennox as would bring it under the terms of the contract and that they were damaged by reason of the writ of injunction issued by the Supreme Court upon application of the cotton association on September 18, 1929, and dissolved on October 23, 1929, then they would be entitled to the amount of damages sustained for that reason. In other words, the trial court should determine only the two issues above stated. Whatever amount of damages, if any, that the association is entitled to recover for failure to deliver to it by Lennox & Lennox any cotton produced or acquired by them during the year 1925, should be added to the sum of $46,066.14; and whatever amount of damages, if any, should be recovered by Lennox & Lennox against the association by reason of the issuance of the writ of injunction by the Supreme Court in respect of the 1,559 bales of cotton on September 18, 1929, should be added to the sum of $32,623.20 adjudged by the trial court in favor of Lennox & Lennox and the two amounts balanced and judgment be entered accordingly in favor of the party entitled to the difference.

CURETON, C. J.

Judgments of the district court and Court of Civil Appeals both reversed, and the cause

remanded with instructions, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.